RANDY S. GROSSMAN
United States Attorney
KATHERINE L. PARKER, SBN 222629
Chief, Civil Division
SAMUEL W. BETTWY, SBN 94918
STEPHANIE A. SOTOMAYOR, Illinois SBN 6325877
Assistant U. S. Attorneys
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
(619) 546-7634/7125/9590 / 7751 (fax)

Attorneys for Defendant
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.A.M., a minor child; O.A.M., a minor child; and THELMA MEDINA NAVARRO, their mother,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No. 22-cv-380 GPC DEB<br><br>Hearing:<br><br>TIME: 1:30 p.m.<br>DATE: July 1, 2022<br>CTRM: 2D (Schwartz)<br><br>Hon. Gonzalo P. Curiel<br><br>[No oral argument pursuant to L.R. 7.d.1.] |

## MEMORANDUM OF POINTS AND AUTHORITIES

### IN SUPPORT OF MOTION TO DISMISS

### OR FOR SUMMARY JUDGMENT

(Fed. R. Civ. P. 12(b)(1), 12(b)(6), 56(a))

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**                                                   ii

**MOTION**                                                                 1

**MEMORANDUM OF POINTS AND AUTHORITIES**                                   1

I. INTRODUCTION                                                            1

II. STATEMENT OF FACTS                                                     2

III. ANALYSIS                                                              6

  A. LEGAL STANDARDS                                              6

    1. Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction   6

    2. Rule 56(c) motion for summary judgment                6

  B. DISCRETIONARY FUNCTION EXCEPTION                             8

    1. CBP officers lawfully exercised their investigative discretion   11

    2. The discretionary function exception was designed to shield the kinds of judgments that CBP officers made to investigate whether J.A.M. was a victim of human trafficking and to reunite her with her mother   15

IV. CONCLUSION                                                            17

# TABLE OF AUTHORITIES

## CASES

*Alfrey v. United States*, 276 F.3d 557 (9th Cir. 2002) .......................................... 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................. 7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 7

*Berkovitz v. United States*, 486 U.S. 531 (1988) ....................................... 9, 10, 15

*Bibeau v. Pac. Nw. Research Found.*, 339 F.3d 942 (9th Cir. 2003) ..................... 9

*Blanco Ayala v. United States*, 386 F. Supp. 3d 635 (E.D. Va. 2019),
   *aff'd*, 982 F.3d 209 (4th Cir. 2020) ............................................................. 16, 17

*Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145 (9th Cir. 1998) ........................ 7

*Brady v. United States*, 211 F.3d 499 (9th Cir. 2000) ........................................... 8

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336 (9th Cir. 1996) ................................ 6

*California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*,
   818 F.2d 1466, 1468 (9th Cir. 1987) ................................................................. 8

*Campbell v. U.S. Dep't of Educ.*, No. 10-cv-266 JLS (WMc),
   2010 WL 2605803, (S.D. Cal. June 28, 2010) ................................................... 6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................... 7

*D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016) ................................................... 16

*Dalehite v. United States*, 346 U.S. 15 (1953) ...................................................... 9

*Douglas v. United States*, 796 F. Supp. 2d 1354 (M.D. Fla. 2011) ..................... 17

*Gasho v. United States*, 39 F.3d 1420 (9th Cir. 1994) ........................................ 10

*Gen. Dynamics Corp. v. United States*, 139 F.3d 1280 (9th Cir. 1998) ............... 9

*Gonzalez v. United States*, 814 F.3d 1022 (9th Cir. 2016) ................................. 15

*Khalaj v. United States*, 474 F. Supp. 3d 1029 (D. Ariz. 2020),
   *aff'd*, No. 20-16607, 2021 WL 4197725 (9th Cir. Sept. 15, 2021) ................... 17

*Laningham v. U.S. Navy*, 813 F.2d 1236 (D.C. Cir. 1987) .................................... 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........... 8

*Miller v. United States*, 163 F.3d 591 (9th Cir. 1998) ........................................ 10

*Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2012) .................................................... 16

*O'Ferrell v. United States*, 968 F. Supp. 1519 (M.D. Ala. 1997) ...................................... 10

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) .............................. 16

*Romero v. Garland*, 7 F.4th 838 (9th Cir. 2021) ............................................................ 12

*Savage v. Glendale Union High Sch.*, 343 F.3d 1036 (9th Cir. 2003) ........................... 6

*United States v. Gaubert*, 499 U.S. 315 (1991) ............................................................ 9, 10

*United States v. Mitchell*, 445 U.S. 535 (1980) ............................................................... 8

*United States v. Orleans*, 425 U.S. 807 (1976) ............................................................... 8

*United States v. Varig Airlines*, 467 U.S. 797 (1984).................................................... 9, 15

*Vacek v. United States Postal Serv.*, 447 F.3d 1248 (9th Cir. 2006)................................. 6

*Warren v. United States Dept. of Interior Bureau of Land Management*,
    724 F.2d 776 (9th Cir. 1984) ....................................................................................... 8

## STATUTES

8 U.S.C. § 1229a(c)(2)(A) .............................................................................................. 12

8 U.S.C. § 1232(a) ......................................................................................................... 16

8 U.S.C. § 1232(a)(2)(A) ................................................................................................ 12

8 U.S.C. § 1232(a)(2)(C) ................................................................................................ 12

8 U.S.C. § 1232(a)(2)(C)(ii) ........................................................................................... 12

8 U.S.C. § 1232(a)(4).................................................................................................... 12

28 U.S.C. § 2680............................................................................................................ 8

28 U.S.C. § 2680(a) ....................................................................................................... 9

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
    Pub. L. No. 110-457, 122 Stat. 5044 (codified as 8 U.S.C. § 1232) ...................... 16

## OTHER AUTHORITIES

DHS, Department of Homeland Security Strategy to Combat Human Trafficking,
    the Importation of Goods Produced with Forced Labor, and Child Sexual
    Exploitation, https://www.dhs.gov/publication/strategy-combat-human-
    trafficking-importation-goods-produced-forced-labor-and-child................................. 16

UNICEF, *Child Trafficking*, https://www.unicefusa.org/mission/protect/trafficking........ 16

1

**RULES**

2 Fed. R. Civ. P. 12(b)(1) .................................................................................. 1, 6, 17

3 Fed. R. Civ. P. 12(b)(6) ....................................................................................... 1, 6

4 Fed. R. Civ. P. 56(c) ............................................................................................... 1

5

6

**REGULATIONS**

7 8 C.F.R. § 1001.2 .................................................................................................. 12

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION**

The United States hereby moves to dismiss this action under Fed. R. Civ. P. 12(b)(1) or, in the alternative, under Fed. R. Civ. P. 12(b)(6) or for judgment in favor of the United States under Fed. R. Civ. P. 56(a).

**MEMORANDUM OF POINTS AND AUTHORITIES**

I

INTRODUCTION

J.A.M. and O.A.M. and their mother ("Plaintiffs") are suing the United States under the Federal Torts Claims Act (FTCA) due to the protective custody of J.A.M. and O.A.M., by U.S. Customs and Border Protection (CBP), after they arrived at the San Ysidro port of entry, unaccompanied, and were referred from primary inspection to secondary inspection and then from secondary inspection to the Admissibility Enforcement Unit (AEU) on March 18, 2019. In a twist on the so-called family separation cases, Plaintiffs are suing the United States for actions that successfully resulted in a family reunification at the port of entry, achieved within all statutory mandates and restrictions.

The crux of Plaintiffs' Complaint is their allegation that CBP officers in the AEU subjected J.A.M.[1] and O.A.M. to "several hours of interrogation, intimidation, and threats," cold temperatures, and food deprivation to elicit false coerced confessions. [Complaint, paras. 25-32, 54.] Plaintiffs' case utterly collapses because, *within twenty minutes* of their application for admission to the United States, J.A.M. and O.A.M. separately told CBP Officer Willmy Lara in the secondary inspection office that J.A.M. was really a noncitizen named Melany Medina Tapia who was born in Tijuana, Mexico. And the following morning, J.A.M. (as Melany) continued to tell Mexican consular officers that she was born in Tijuana. Plaintiffs' allegations of coerced false confessions in the AEU are not only demonstrably false; they are implausible.

---

[1] For purposes of this motion only, the United States assumes as true, but does not otherwise admit, Plaintiffs' allegation that the minor who accompanied O.A.M. was J.A.M.

It is implausible that Officer Lara could have done anything in the span of twenty minutes to elicit false confessions in the secondary inspection office (indeed, Plaintiffs do not allege that he did) or that he would have a reason to try; it is implausible that J.A.M. was afraid to tell Mexican consular officers anything but the truth (Plaintiffs do not mention either of the consular interviews of J.A.M.); and it is implausible that the CBP officers in the AEU had any reason to elicit a "confession" during the screening process. Even though, by all indications, O.A.M. and others had attempted to smuggle a noncitizen minor into the United States, everything that CBP officers did was focused solely on returning her safely to her parents in Tijuana, regardless of who she really was.

The United States welcomes an opportunity, through discovery, to show that CBP officers acted reasonably and lawfully and to scrutinize what motivated J.A.M. and O.A.M. to state from the outset and throughout the process that J.A.M. was an imposter who was born in Tijuana, Mexico. Before reaching discovery, however, this Court should consider dismissing Plaintiffs' claims under the discretionary function exception of the FTCA. CBP officers in the AEU lawfully exercised investigative discretion to carry out their mandates under 8 U.S.C. § 1232 to accomplish exactly what Congress intended be done within 48 hours – the safe reunification of J.A.M. with her mother.

II

STATEMENT OF FACTS

Plaintiff Thelma Medina Navarro (Medina) is the mother of Plaintiffs J.A.M. and O.A.M. [Complaint at 1.] At all times relevant to this case, all three resided in Tijuana, Mexico. [Complaint, para. 13.] On March 18, 2019, at about 7:30 a.m., J.A.M. and O.A.M. applied for admission at the Pedestrian West facility of the San Ysidro, California port of entry, unaccompanied by a parent or other adult. [Complaint, paras. 16-17; Ex. 1.][2] Both were minors at the time. [Complaint, para. 5.]

---

[2] "Ex." refers to a true copy of selected documents that the undersigned received from CBP and CRCL. The undersigned has interviewed CBP Officers Viger, Lara, Vincent, Corrales, Ascher, and Marin and has determined that they are competent to testify at trial to their actions and observations, which are described in this motion.

Both J.A.M. and O.A.M. presented U.S. passport cards to the primary inspector, CBP Officer Dennese Viger. [Complaint, para. 17; Exs. 1-2.] Officer Viger noticed that, in the photo on J.A.M.'s passport card, she had a mole on her upper lip [Ex. 2], but did not personally present with a mole or a scar at the time. [Exs. 1, 6.] Officer Viger asked J.A.M. if she had a mole removed on her lip, and she stated that she did not remember. [Ex. 1.] Officer Viger then asked J.A.M. questions about how often and where she usually crossed, and J.A.M. stated that she was not sure. [*Id*.] Officer Viger asked J.A.M. for another photo ID for clarification of her identity, and J.A.M. handed her a school ID that did not resemble her. [*Id*.] Officer Viger therefore referred J.A.M. and O.A.M. to the secondary inspection office. [Complaint, para. 17; Exs. 1, 5.]

CBP Officer Smith Vincent escorted the two minors into the adjacent secondary office. [Ex. 5; Lara Declaration, para. 2.] While the minors were seated in the waiting area, CBP Officers Vincent and Kim conducted database research about J.A.M. [Ex. 5; Lara Declaration, para. 4.] They found her passport photo in the U.S. State Department database to confirm that there was a large mole on the upper lip, which was not present on J.A.M. at the time. [*Id*.] They also checked the crossing history of J.A.M. and O.A.M. and noted that they had crossed together seven days earlier, on March 11, 2019. [*Id*.]

Within ten to twenty minutes, CBP Officer Willmy Lara spoke to both children as they sat together. [Complaint, para. 17; Ex. 5; Lara Declaration, paras. 3-4.] He asked them when they had last entered together, and O.A.M. responded that the last time was in February. [Ex. 5; Lara Declaration, para. 4.] Because of that and other discrepancies, Officer Lara questioned the two children individually in a separate area of the secondary inspection office. [Complaint, para. 17; Ex. 5; Lara Declaration, para. 4.] Both J.A.M. and O.A.M. independently stated that J.A.M. was a noncitizen named Melany Medina Tapia and that J.A.M. (as Melany) was using J.A.M.'s U.S. passport card since J.A.M. and Melany resemble each other. [Ex. 5; Lara Declaration, para. 4.]

///

///

At about 7:40 a.m., J.A.M. and O.A.M. were therefore referred to the Admissibility Enforcement Unit (AEU) in the Pedestrian East facility of the San Ysidro port of entry for screening and repatriation pursuant to 8 U.S.C. § 1232. [*Id.*] In the AEU, both children continued to state that J.A.M. was noncitizen Melany Medina. J.A.M. stated that she was born in Tijuana on a different date [Exs. 1, 5, 6, 7] and that her mother, Viviana Tapia, and her father were Mexican citizens, residing in Tijuana, Baja California, Mexico. She stated that she (as Melany) was using J.A.M.'s U.S. passport card so she could attend school in San Ysidro, California. [Exs. 7, 19.] O.A.M. stated that he was assisting J.A.M. (as Melany) as a favor to his uncles. [Complaint, para. 28; Exs. 7, 9-10.]

Both J.A.M. and O.A.M. also stated that Michelle Cardenas had driven them to the San Ysidro port of entry. [Exs. 7, 20; *see also* Complaint, para. 14; Ex. 13.] CBP officers in the AEU researched their databases and discovered that Michelle Cardenas had a criminal history of human and currency smuggling. [Ex. 20.] *See, e.g., United States v. Cardenas*, No. 11cv5215-L, Doc. 64 (judgment) (S.D. Cal. Mar. 7, 2012) (inducing and encouraging illegal aliens to enter the United States and aiding and abetting).

At about 6:00 p.m., Plaintiff Medina arrived at the port of entry, asserting that she was the mother of J.A.M. and O.A.M. [Ex. 20; Ascher Declaration, para. 3.] Supervisory CBP Officer Anthony Ascher spoke to both children, and they stated that Plaintiff Medina was J.A.M.'s aunt. [*Id.*] At about 6:30 p.m., Officer Ascher contacted the Mexican consulate, asking it to interview J.A.M. to determine her identity. [*Id.*] A consular employee stated that the consulate would send representatives the following morning to interview J.A.M. [*Id.*]

At about 6:40 p.m., a CBP officer telephoned Plaintiff Medina and informed her that J.A.M. (as Melany) was not a U.S. citizen. [Ex. 17.] At about 8:00 p.m., a CBP officer telephoned Plaintiff Medina and informed her that she could pick up O.A.M. [*Id.*] O.A.M. was admitted to the United States to the custody of his mother Plaintiff Medina. [Complaint, paras. 22-23; Ex. 17.] O.A.M. had not, however, changed his story that J.A.M. was his cousin Melany. [Ex. 10.]

J.A.M. (as Melany) therefore remained overnight in the protective custody of CBP. Logs show that CBP officers conducted frequent, periodic welfare checks and temperature checks and that they provided regular meals to J.A.M. [*See* Ex. 8.]

The following morning, Plaintiff Medina went to the Mexican consulate. They told her to be patient and that they were going to interview J.A.M. [Ex. 17.] At about 9:30 a.m., two Mexican consular officers interviewed J.A.M. in private, and she continued to state that she was born in Tijuana, Mexico. [Ex. 20.] The consular officers advised CBP that they were satisfied that J.A.M. (as Melany) was a Mexican citizen. [*Id*.] CBP therefore made arrangements to transfer J.A.M. (as Melany) to the custody of the Mexican consulate for repatriation. [Ex. 8.] Presumably the consulate informed Plaintiff of its interview.

That afternoon, presumably after speaking with Plaintiff Medina, the Mexican Deputy Consul visited the AEU and reinterviewed J.A.M. [Ex. 20.] At about 3:00 p.m., the Deputy Consul informed Watch Commander CBP Officer Mariza Marin of the possibility that J.A.M. was a U.S. citizen and suggested that CBP reinterview her. [*Id*.] Officer Marin reinterviewed J.A.M., and apparently as a result of her discussion with the Deputy Consul, J.A.M. stated that she was J.A.M., not Melany. [*Id*.]

CBP continued to coordinate with the Mexican consulate to return J.A.M. to Mexico. [Complaint, para. 24; Ex. 20.] At about 5:00 p.m., the consulate contacted Plaintiff Medina and told her to go to the port of entry to pick up J.A.M. [Ex. 17.] At about 6:00 p.m., Plaintiff Medina arrived at the port of entry, and J.A.M. was in the custody of Mexican consular officers. [*Id*.] At about 6:30 p.m., J.A.M. was reunited with Plaintiff Medina. [Ex. 20.]

On April 3, 2019, DHS's Office of Civil Rights and Civil Liberties (CRCL) received a complaint from the American Friends Service Committee, relaying the complaint of Plaintiff Medina about the detention of her children at the port of entry. [Exs. 12-18.] CRCL conducted an inquiry and concluded that "CBP appeared to follow the appropriate policies and procedures as it pertains to admittance into the U.S.," recommending that the complaint be closed without further action. [Ex. 20.]

On March 21, 2022, Plaintiffs commenced the instant action. [ECF No. 1.]

III

ANALYSIS

A.    LEGAL STANDARDS

1. *Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction*

The United States asserts that sovereign immunity bars Plaintiffs' FTCA action, under the discretionary function exception of the FTCA. As such, this Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Sovereign immunity is an important limitation on the subject matter jurisdiction of federal courts. The United States, as sovereign, can only be sued to the extent it has waived its sovereign immunity." *Campbell v. U.S. Dep't of Educ.*, No. 10-cv-266 JLS (WMc), 2010 WL 2605803, at *3 (S.D. Cal. June 28, 2010) (quoting *Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1259 (9th Cir. 2006)).

In general, for purposes of a motion to dismiss, it is assumed that Plaintiffs' allegations are true. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) ("All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."). However, "[i]n resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. The court need not presume the truthfulness of the plaintiff's allegations." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citations omitted). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003).

2. *Rule 12(b)(6) motion to dismiss or Rule 56(a) motion for summary judgment*

As stated above, this Court may review evidence beyond the complaint without converting the motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment. This Court may also reject Plaintiffs' allegations in the context of Rule 12(b)(6) or 56(a) if their allegations are implausible. J.A.M. and O.A.M. stated that J.A.M.

was a noncitizen imposter from the outset and throughout – to Officer Lara, to CBP officers in the AEU, and to Mexican consular officers. J.A.M. and O.A.M. had no apparent reason to lie, and neither CBP officers nor Mexican consular officers had any reason to use coercive interrogation techniques.

The party moving for summary judgment has the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the non-moving party fails to "set forth specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), the moving party is "entitled to judgment as a matter of law." *Celotex Corp*., 477 U.S. at 323.

While this Court must view evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, this Court may reject Plaintiffs' mere allegations if they are not plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed"). *See also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). (the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of' his or her position."); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (the non-moving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial.").

The plausibility standard may be applied to decide whether there is a genuine issue of material fact. *See Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998) ("If the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show that there is a genuine issue for trial") (citing *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc*., 818 F.2d 1466, 1468 (9th Cir. 1987) ("No

longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment.")). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) ("It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.")

As discussed further below, Plaintiffs cannot plausibly or genuinely dispute that CBP officers exercised investigative discretion within the mandates of 8 U.S.C. § 1232 and the confines of the U.S. Constitution.

B.    DISCRETIONARY FUNCTION EXCEPTION OF THE FTCA

The United States can be sued "only to the extent that it has waived its immunity." *United States v. Orleans*, 425 U.S. 807, 814 (1976). The "terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quotation omitted). A district court's jurisdiction to entertain FTCA actions is limited by the specific terms of the Act. *See Warren v. United States Dept. of Interior Bureau of Land Management*, 724 F.2d 776, 777 (9th Cir. 1984). As a waiver of sovereign immunity, the FTCA must be strictly construed in favor of the United States. *See Brady v. United States*, 211 F.3d 499, 502 (9th Cir. 2000).

In the FTCA, the United States has waived its sovereign immunity as to certain Common Law tort claims, and some types of claims are expressly excepted from the waiver. *See* 28 U.S.C. § 2680. The discretionary function exception reads as follows:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) *Any claim based upon an act or omission of an employee of the Government*, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added). Therefore, if an alleged tort arises from discretionary conduct, a court may lack subject matter jurisdiction over the claim. *See Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998) ("If [the discretionary function exception] applies, sovereign immunity is not waived, and no subject matter jurisdiction exists.").

The Supreme Court has established a two-part test for the application of section 2680(a). First, it must be determined whether the exercise of discretion violated a mandatory regulation or policy. The discretionary function exception does not apply "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quotation omitted), and the employee failed to follow it. *See also Bibeau v. Pac. Nw. Research Found.*, 339 F.3d 942, 945 (9th Cir. 2003) ("First, we ask whether the alleged wrongful conduct violated a specific and mandatory regulation or statute."). "In general, governmental conduct cannot be discretionary if it violates a legal mandate," including the Constitution. *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000). *See also Owen v. City of Indep., Mo.*, 445 U.S. 622, 649 (1980) ("A municipality has no discretion to violate the Federal Constitution; its dictates are absolute and imperative.").

Second, "a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *See Berkovitz v. United States*, 486 U.S. 531, 536 (1988). In section 2680(a), "Congress wished to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). Where there is room for policy judgment, such judgments are of the kind protected by section 2680(a). *See Berkovitz*, 486 U.S. at 537.

"If a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324 (citing *Dalehite v. United States*, 346 U.S. 15, 36 (1953)). "[T[he very existence of the regulation

creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id*. "Where the government agent is exercising discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Miller v. United States*, 163 F.3d 591, 593-94 (9th Cir. 1998) (quoting *Gaubert*, 499 U.S. at 324).

The FTCA discretionary function exception does not permit further inquiry into whether the CBP officers acted negligently or committed intentional torts while lawfully exercising their investigative discretion. *See* 28 U.S.C. § 2680(a) (The FTCA's waiver of sovereign immunity applies to "*[a]ny claim* based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused*.") (emphasis added); *O'Ferrell v. United States*, 968 F. Supp. 1519, 1540 (M.D. Ala. 1997) ("The fact that [the challenged conduct] may have been negligent, wrongful, intentional, or an abuse of discretion does not make the discretionary function exception inapplicable."), *aff'd* 253 F.3d 1257 (11th Cir. 2001).

Negligence is irrelevant as long as the CBP officers' actions involved permissible exercise of policy judgment. *See Gaubert*, 499 U.S. at 326 (citing *Berkovitz*, 486 U.S. at 538 n.3). "[I]f the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability." *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989). The discretionary function exception also applies to intentional torts. *See Gasho v. United States*, 39 F.3d 1420, 1435 (9th Cir. 1994) ("If a defendant can show that the tortious conduct involves a 'discretionary function,' a plaintiff cannot maintain an FTCA claim, even if the discretionary act constitutes an intentional tort under § 2680(h).").

The discretionary function exception bars all of Plaintiffs' claims, because CBP officers exercised discretion within the mandates of 8 U.S.C. § 1232 and the confines of the U.S. Constitution.

1. *CBP officers lawfully exercised their investigative discretion*

Here, CBP officers exercised investigative discretion in carrying out the following statutory mandates:

**8 U.S. Code § 1232 - Enhancing efforts to combat the trafficking of children**

**(a) Combating child trafficking at the border and ports of entry of the United States**
…
**(2) Special rules for children from contiguous countries**
**(A) Determinations**
    Any unaccompanied alien child who is a national or habitual resident of a country that is contiguous with the United States shall be treated in accordance with subparagraph (B), if the Secretary of Homeland Security *determines*, on a case-by-case basis, that—

    (i) such child *has not been a victim of a severe form of trafficking in persons, and there is no credible evidence that such child is at risk of being trafficked upon return to the child's country of nationality or of last habitual residence*;
    …
**(C) Contiguous country agreements**
    The Secretary of State shall negotiate agreements between the United States and countries contiguous to the United States with respect to the repatriation of children. Such agreements shall be designed to protect children from severe forms of trafficking in persons, and shall, at a minimum, provide that—

    (i) no child *shall be returned* to the child's country of nationality or of last habitual residence unless returned *to appropriate employees or officials,* including child welfare officials where available*, of the accepting country's government*;

    (ii) no child shall be returned to the child's country of nationality or of last habitual residence outside of reasonable business hours; and …
    …
**(4) Screening**
    *Within 48 hours of the apprehension of a child who is believed to be described in paragraph (2)(A)*, but in any event prior to returning such child to the child's country of nationality or of last habitual residence, *the child shall be screened to determine whether the child meets the criteria listed in paragraph (2)(A)*. . .

8 U.S.C. § 1232 (emphasis added).

In sum, CBP officers must screen any unaccompanied noncitizen[3] child who is a "habitual resident of a country that is contiguous with the United States" to determine, among other things, whether the child has been the victim of human trafficking or will be the victim of human trafficking if returned to his or her country of residence. 8 U.S.C. § 1232(a)(2)(A). CBP officers are authorized 48 hours to make arrangements through the Mexican or Canadian consulate for the safe repatriation of the child. *See* 8 U.S.C. § 1232(a)(4). *See also* 8 U.S.C. § 1232(a)(2)(C)(ii) (within "reasonable business hours").

CBP officers in the AEU followed those mandates: they conducted screening to make sure that J.A.M. (as Melany) was not "a victim of a severe form of trafficking in persons" by interviewing both J.A.M. and O.A.M., by conducting database research concerning Michelle Cardenas and other matters, by speaking with Plaintiff Medina, and by contacting the Mexican consulate to interview J.A.M. *See* 8 U.S.C. § 1232(a)(2)(A)(i) & (a)(4). They also followed the mandates by making arrangements to turn J.A.M. (as Melany) over to the custody of the Mexican consulate ("the accepting country's government") to ensure her safe return to her home in Tijuana. *See* 8 U.S.C. § 1232 (a)(2)(A) & (a)(2)(C). And they completed the entire process within the statutorily mandated 48 hours. *See* 8 U.S.C. § 1232(a)(4).

Plaintiffs do not assert that CBP officers failed to follow the mandates of 8 U.S.C. § 1232. They contend that, in the exercise of their discretion, CBP officers committed Common Law torts and violated the U.S. Constitution (*Bivens* claims). The discretionary function exception supersedes the Common Law claims, as explained above, and the constitutional claims are meritless.

---

[3] As applicants for admission to the United States, J.A.M. and O.A.M. were presumptively inadmissible noncitizens. *See, e.g., Romero v. Garland*, 7 F.4th 838, 841 (9th Cir. 2021) ("The 'clearly and beyond doubt' burden under 8 U.S.C. § 1229a(c)(2)(A) unambiguously applies only to applicants for admission."); 8 C.F.R. § 1001.2 ("Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry."). Both J.A.M. and O.A.M. claimed that J.A.M. was a noncitizen, and the Mexican consulate confirmed their claim. CBP officers were therefore operating within the authority and mandates of 8 U.S.C. § 1232 as to J.A.M., and they made a discretionary decision to detain O.A.M. to verify his identity and to carry out their screening process as to J.A.M.

In their Fifth Cause of Action, Plaintiffs assert a *Bivens* claim under the Fourth Amendment due to "the arrest, detention, unnecessary and extended restraint, incarceration and interrogation" of J.A.M. and O.A.M. [Complaint, para. 59.] Yet, the decision to detain and question J.A.M. and O.A.M. is contemplated by the statute, 8 U.S.C. § 1232(a)(4) ("apprehension" and "screening" "within 48 hours"). The length of detention in this case was due to the statements of J.A.M. and O.A.M., from the outset and throughout the process, that J.A.M. was a noncitizen imposter.

As explained above, CBP officers in the AEU were mandated to conduct a screening to ensure that J.A.M. was not "a victim of a severe form of trafficking in persons." 8 U.S.C. § 1232(a)(2)(C). That screening process included: J.A.M.'s protective custody at the AEU; the decision to have Mexican consular officers question J.A.M.; detention of O.A.M. until he could be identified, his information could be obtained, and his mother was available to take custody; retrieval, interpretation, and consideration of database information; questioning the children together and individually; and speaking to Plaintiff Medina.

Plaintiffs do not dispute anywhere in their Complaint the actions of CBP officers in secondary inspection to refer J.A.M. and O.A.M. to the AEU. Their allegations that CBP officers in the AEU used interrogation techniques to wear them down and extract false confessions are both implausible and demonstrably false. J.A.M. and O.A.M. had already stated that J.A.M. was an imposter who was born in Tijuana when they were in secondary inspection, within minutes of being referred there, and J.A.M. repeated it to Mexican consular officers. There is no plausible reason for coercing such statements: prosecution was not the function of CBP officers in the AEU. Indeed, they discovered that a known human smuggler had driven J.A.M. and O.A.M. to the port of entry, but that information was considered only as part of the screening process to ensure that J.A.M. was not a victim of human trafficking. No criminal investigation was pursued; no one was read their *Miranda* rights; and no one was charged with the ostensible attempted smuggling. Even though he had admitted a smuggling attempt, O.A.M. was simply reunited with his mother, and arrangements were made to return J.A.M. to Mexico through the Mexican consulate.

Plaintiffs' Sixth Cause of Action repeats their Fifth Cause of Action regarding detention and accuses CBP officers of "separat[ing] J.A.M. and O.A.M. from Mrs. Medina." [Complaint, para. 64 (*Bivens* claim under the Fifth Amendment).] Yet, no adult accompanied J.A.M. at the port of entry, and CBP officers reunited J.A.M. with her mother, precisely as Congress intended in that situation. The TVPRA[4] "requires, whenever possible, family reunification or other appropriate placement in the best interest of the unaccompanied alien children." 154 Cong. Rec. S10886-01, S10887, 2008 WL 5169970 (Dec. 10, 2008). Plaintiffs' claim of parent-child separation is therefore wholly unfounded.

In their Seventh Cause of Action, Plaintiffs assert a *Bivens* equal protection claim under the Fifth Amendment, based on their allegation that J.A.M. was detained because one of the CBP officers thought she "looked Honduran." [Complaint, para. 69.] The allegation and claim are frivolous. J.A.M. was referred to the secondary inspection office due to the appearance a mole or other mark on her upper lip in the passport card photo, not because of any other physical feature. And she was referred to the AEU only because she and O.A.M both stated that she was a noncitizen imposter. Plaintiffs make no allegations to support a discrimination claim, and under these circumstances, there can be no basis for alleging discrimination. Any consideration of J.A.M.'s appearance, her language, her accent, her vocabulary, and so on fell precisely within the screening process contemplated by the statute for the purpose of determining J.A.M.'s *nationality* and safely repatriating her and reuniting her with her parents.[5] Given the complexity of the investigative work of CBP officers, such considerations involve a "permissible exercise of policy judgment," *Berkovitz*, 486 U.S., at 538, n.3., "the kind that the discretionary function exception was designed to shield" from "judicial 'second guessing.'" *Id.* at 536; *see also Varig Airlines*, 467 U.S. at 814.

---

[4] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 (codified as 8 U.S.C. § 1232).

[5] *See, e.g., Sesay v. Chertoff*, No. 07cv2354 JM-LSP, 2008 WL 4790972 (S.D. Cal. Oct. 30, 2008), *decision vacated, appeal dismissed sub nom. Sesay v. Napolitano*, 361 F. App'x 747 (9th Cir. 2010) (district court appointed an expert witness, agreed upon by the parties, to assist in determining whether the petitioner was from Sudan or Sierra Leone); *id.* at *2 ("Petitioner was unaware of basic features of Dinka life and did not understand rudimentary Dinka words nor could he identify any culturally-based knowledge.").

2. *The discretionary function exception was designed to shield the kinds of judgments that CBP officers made to investigate whether J.A.M. was a victim of human trafficking and to reunite her with her mother*

The second step of the discretionary function test is satisfied, because the actions of CBP officers were "grounded in policy" when exercising investigative discretion. The Ninth Circuit has repeatedly ruled that the discretionary function exception applies to the decision of law enforcement how to conduct criminal investigations, including the scope and conduct of the investigation, because "[i]nvestigations by federal law enforcement officials . . . clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation." *Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996). *See also Gonzalez v. United States*, 814 F.3d 1022, 1032 (9th Cir. 2016) ("The investigation of crime involves policy judgments at the core of the executive branch"); *Alfrey v. United States*, 276 F.3d 557, 566 (9th Cir. 2002) ("As we recognized in *Sabow*, investigations by federal officers clearly involve the type of policy judgment protected by the discretionary-function exception.").

Here, CBP officers were mandated to conduct an investigative screening process to combat "child trafficking at the border and ports of entry of the United States," 8 U.S.C. § 1232(a), and as the Supreme Court held, "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324. *See also D.B. v. Cardall*, 826 F.3d 721, 738 (4th Cir. 2016) (emphasis added) ("The intricate web of statutory provisions relating to UACs reflects Congress's unmistakable desire to protect that vulnerable group. The statutory heading of 8 U.S.C. § 1232—"Enhancing efforts to combat the trafficking of children"—confirms that purpose.").

The United States is "considered one of the top destination points for victims of child trafficking and exploitation," UNICEF, *Child Trafficking*, https://www.unicefusa.org/mission/protect/trafficking (last visited Apr. 22, 2022), and at

the ports of entry, CBP officers constitute the vanguard of protecting unaccompanied minors by carrying out the mandates of 8 U.S.C. § 1232. *See also* DHS, Department of Homeland Security Strategy to Combat Human Trafficking, the Importation of Goods Produced with Forced Labor, and Child Sexual Exploitation, https://www.dhs.gov/publication/strategy-combat-human-trafficking-importation-goods-produced-forced-labor-and-child (last visited May 4, 2022).

The decisions that CBP officers made in this case are exactly the kinds of decisions that should be shielded from judicial second-guessing in hindsight. As the Ninth Circuit stated: "Rather than mere 'disclosure of normal domestic law-enforcement priorities and techniques' [immigration] cases often involve 'the disclosure of foreign-policy objectives and (as in this case) foreign-intelligence products.'" *Mirmehdi v. United States*, 689 F.3d 975, 983 (9th Cir. 2012) (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)). "[A]s courts have acknowledged, immigration officials operate with limited resources and 'must weigh various policy considerations in deciding which suspected aliens to detain, how to detain them, and how to investigate claims of citizenship by detained aliens.'" *Blanco Ayala v. United States*, 386 F. Supp. 3d 635, 642 (E.D. Va. 2019), *aff'd*, 982 F.3d 209 (4th Cir. 2020) (quoting *Douglas v. United States*, 796 F. Supp. 2d 1354, 1369 (M.D. Fla. 2011)) (discretionary function exception applied to DHS's erroneous determination that the plaintiff was a noncitizen and its initiation of removal proceedings, because the decision involved an "element of judgment or choice"). *See also Khalaj v. United States*, 474 F. Supp. 3d 1029, 1039 (D. Ariz. 2020), *aff'd*, No. 20-16607, 2021 WL 4197725 (9th Cir. Sept. 15, 2021) ("In sum, the Court finds that the CBP Officers' decision not to allow Khalaj to leave the Customs area falls within the discretionary function exception.")

All of Plaintiffs' FTCA claims should therefore be dismissed under the discretionary function exception of the FTCA. Plaintiffs cannot plausibly or genuinely allege unlawful conduct on the part of CBP officers.

///

IV

<u>CONCLUSION</u>

In effect, Plaintiffs are suing the United States and CBP officers for doing their job. From the outset and throughout the process, J.A.M. and O.A.M. asserted that J.A.M. was a noncitizen imposter. CBP officers in the AEU lawfully followed the mandates of 8 U.S.C. § 1232, and they exercised investigative discretion to screen whether J.A.M. (as Melany) was a victim of human trafficking, to coordinate with the Mexican consulate for her safe return to Mexico, and to complete their task within the 48-hour limitation. The discretionary function exception of the FTCA therefore bars Plaintiffs' FCTA claims, and this case should be dismissed under Fed. R. Civ. P. 12(b)(1). In the alternative, Plaintiffs have failed to plausibly allege unlawful conduct and, for that reason, have failed to raise a genuine issue of material fact. The case should therefore be dismissed, in the alternative, under Rule 12(b)(6) or adjudged in favor of the United States under Rule 56(a).

DATED: May 24, 2022

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

KATHERINE L. PARKER
Chief, Civil Division

s/ *Samuel W. Bettwy*

SAMUEL W. BETTWY
Assistant U.S. Attorney

STEPHANIE A. SOTOMAYOR
Assistant U.S. Attorney

Attorneys for Defendant
United States of America