Joseph M. McMullen, Esq. (SBN 246757)
Law Offices of Joseph M. McMullen
501 W. Broadway, Suite 1510
San Diego, California 92101
Telephone: (619) 501-2000
Facsimile: (619) 615-2264
E-Mail: joe@jmm-legal.com

Attorney for Plaintiffs J.AM., O.A.M.,
and Thelmo Medina Navarro

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.A.M., a minor child; O.A.M., a minor child; and THELMA MEDINA NAVARRO, their mother<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>　　　　Defendants. | Case No. 22-CV-0380-GPC-DEB<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) [ECF No. 4]**<br><br>Hearing Date:　　July 22, 2022<br>Hearing Time:　　1:30 p.m.<br>Courtroom:　　　2D (Schwartz)<br>Judge:　　　　　Hon. Gonzalo P. Curiel |

## I.　　Introduction[1]

In March 2019, 14-year old O.A.M. and his little sister, 9-year-old J.A.M., were United States citizens by birth who routinely crossed the U.S.-Mexico border to attend their high school and elementary school in San Diego County. On Monday, March 18, 2019, around 7:30 a.m., O.A.M. and J.A.M. presented their valid U.S. Passport Cards to the primary inspection officer at the San Ysidro Port of Entry pedestrian entrance

---

[1] All of the facts set forth in section I are alleged in the Complaint (ECF No. 1) at ¶¶ 5 through 30, and are set forth in the attached sworn Declaration.

("PedWest") and were referred to secondary inspection. During the custodial secondary inspection beginning around 7:40 a.m., at first O.A.M. and J.A.M. were questioned together, then they were separated and individually questioned.

Over the course of O.A.M.'s 12 hours and J.A.M.'s 33 hours of custody, CBP officers repeatedly interrogated them, isolated them in various detention areas, forced each child into close quarters with handcuffed adult males, subjected O.A.M. and J.A.M. to inhumane conditions that were terrifying for a child, and repeatedly falsely accused O.A.M. and J.A.M. of being involved in sex-trafficking, prostitution, trafficking in organs, and other smuggling activity without any lawful justification

During the interrogation of O.A.M., CBP officers asked him how many female cousins he had. He answered that he had three cousins and provided their names and respective ages. CBP Officers then made a statement indicating that J.A.M. was actually Melanie, the cousin closest to J.A.M.'s age. O.A.M. insisted that the girl he was with was actually his sister, J.A.M., and not his cousin. A male CBP officer told O.A.M. that his little sister looked too "developed" to be a 9-year-old. CBP officers continued to interrogate O.A.M. about the "true identity" of his sister. He was told that if he did not say that the girl was Melanie, that he would be arrested and charged with human and organ trafficking.

CBP officers told O.A.M. that if he said J.A.M. was Melanie, he would be released immediately. O.A.M. was scared of being arrested and charged with human and organ trafficking, and he finally agreed to say his sister was his cousin. CBP officers coerced O.A.M. into writing out a false declaration in which he stated that he went in the morning to pick up his cousin from her house and brought her to the border. After he wrote the statement, he was released to his mother, Mrs. Medina.

Throughout J.A.M.'s interrogation, CBP officers repeatedly told J.A.M. she was not the girl who was pictured on her U.S. Passport Card. At one point, J.A.M. showed them her school identification card to compare to the passport photo. She also had her school identification card from the previous year. CBP officers told J.A.M. she looked

different than her photo.  They told J.A.M. that if she did not say she was Melanie, her brother was going to be arrested and taken to jail.  CBP officers explained that her brother would be in jail for many years and it would be her fault.  Eventually, the CBP officers shared O.A.M.'s false coerced confession with J.A.M. and added that she was now alone.  The CBP officers kept her in custody for another 24 hours until the following evening.  After a total of approximately thirty-three hours, she was finally released to her mother, Mrs. Medina.

On the first day of the incident, as soon as Mrs. Medina learned about her children not arriving at school, she immediately left the medical clinic in Tijuana while still in the pre-operative stages of her scheduled uterine surgery.  After collecting further identity documents of O.A.M. and J.A.M., Mrs. Medina arrived at PedWest around 11 a.m.  Mrs. Medina asked CBP Officers for her children and provided the CBP Officers with their names and dates of birth.  CBP Officers told Mrs. Medina that her children were not in CBP's custody.  Eventually,  CBP Officers asked to see more documents regarding the children's identity and then told Mrs. Medina that they would check the surveillance cameras.  Mrs. Medina continued to wait.  CBP Officers blamed Mrs. Medina for losing her children, and told her to leave.  Mrs. Medina called 911 and were told by the emergency dispatcher that the issue was not within their jurisdiction.

Mrs. Medina went back into the CBP building and continued to ask for information about her children.  CBP Officers responded that they had so many people detained that they did not know if her children were in their custody.  They advised Mrs. Medina to go to her house and relax and they would let her know about her children later that evening or the next day.  Mrs. Medina continued to wait.

That evening, a CBP officer called Mrs. Medina and told her that O.A.M. was her son but the little girl was not her daughter.  The CBP officer said the little girl in CBP's custody "looked Honduran."  He did not provide additional information and told Mrs. Medina he would call her back.  Around 8 p.m., over 12 hours after her children were taken into CBP custody, Mrs. Medina received a call from CBP telling her she could pick

up O.A.M..  Mrs. Medina arrived at PedEast with more documents and photographs of J.A.M., but she again was told by CBP officers that the girl in their custody was not her daughter.  Mrs. Medina showed the CBP officers family pictures and told them to compare the photos to J.A.M.'s passport photos on file.  The CBP Officers told her that the girl pictured in the photographs was J.A.M., but that the little girl in their custody was not the same person.

CBP Officers released O.A.M. to Mrs. Medina and told her to leave the premises. Mrs. Medina asked the CBP officers if they were going to give her something in writing to explain the detention of her daughter, but they refused her request and threatened to detain Mrs. Medina if she did not leave.  Mrs. Medina went to the Coronado Police Station around 10 p.m. to ask for help finding her daughter, and then went to the Border Patrol station in San Ysidro around 11 p.m.  Border Patrol agents suggested she contact the Mexican Consulate.  Mrs. Medina called the Mexican Consulate and left a voicemail pleading for help.

Mrs. Medina continued her efforts to locate her daughter until around 5 p.m. on Tuesday when she received a call from the Mexican Consulate instructing her where to meet them at the SYPOE.  After 33 hours of terror, Mrs. Medina was reunited with her 9-year-old daughter.

Based on these facts, the Complaint states claims against the United States under the Federal Tort Claims Act (FTCA) for false imprisonment, intentional infliction of emotional distress, negligence, and violation of California Civil Code § 52.1 (The Bane Act) (causes of action 1 through 4) and against individual unnamed Customs and Border Protection Officers for violations of Plaintiffs' Fourth Amendment right against unreasonable seizures, Fifth Amendment Due Process right against interference with the parent-child relationship, and Fifth Amendment Equal Protection rights.

On May 24, 2022, the United States (hereinafter "the government") moved to dismiss counts 1 through 4 under Rule 12(b)(1) based on the FTCA's discretionary function exception.  *See* ECF No. 4.  The government also moved to dismiss for failure

to state a claim under Rule 12(b)(6) and for summary judgment under Rule 56(a), but subsequently in response to Plaintiff's Ex Parte Rule 56(d) Application, ECF No. 10, the government withdrew those motions on June 16, 2022.  ECF No. 11 at 2 ("The United States therefore does not oppose Plaintiffs' *ex parte* application and hereby withdraws its alternative motions under Rules 12(b)(6) and 56(a).").  Plaintiff responds to the Rule 12(b)(1) dismissal motion below.

## II.    Overview of Relevant Law

Before turning to the merits of the government's motion, Plaintiffs provide an overview of the relevant law with respect to (1) the FTCA's discretionary function exception, and (2) the standards applicable to the government's motion under Rule 12(b)(1).

### A.    The FTCA's Discretionary Function Exception

The FTCA's waiver of sovereign immunity is limited by exceptions found in 28 U.S.C. § 2680.  One of those is § 2680(a)'s liability bar for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  This "discretionary function exception" is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort."  *United States v. Gaubert*, 499 U.S. 315, 323 (1991).  Consistent with that purpose, the Supreme Court has established a two-part test for determining whether the exception applies.

First, a court must consider "whether the challenged action involves an element of choice or judgment."  *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000) (citing *Berkovitz*, 486 U.S. at 536).  "This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice."  *Berkovitz*, 486 U.S. at 536.  Thus, for example, "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of

action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Id.*

Second, even "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* "Because the purpose of the exception is to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy' ... when properly construed [it] 'protects only governmental actions and decisions based on considerations of public policy.'" *Gaubert*, 499 U.S. at 323 (quoting *Berkovitz*, 486 U.S. at 537). Thus, for the exception to apply it is "insufficient for the government to show merely that some choice was involved in the decision-making process. The balancing of policy considerations is a necessary prerequisite." *Myers v. United States*, 652 F.3d 1021, 1031 (9th Cir. 2011) (quotations and citations omitted); *see also Sigman*, 217 F.3d at 793 (stating that "[o]nly those exercises of judgment which involve considerations of social, economic, and political policy are excepted from the FTCA by the discretionary function doctrine"); *Fang v. United States*, 140 F.3d 1238, 1242 (9th Cir. 1998) ("the United States is *not* immune... when the claims do not concern actions which are the product of judgment driven by the consideration of competing policy-based choices").

The discretionary function exception does not apply if the federal employee's conduct violates the Constitution since federal employees do not possess discretion to violate constitutional rights. *Galvin v. Hay*, 374 F.3d 739, 757-58 (9th Cir. 2004) ("As federal officials do not possess discretion to violate constitutional rights, the discretionary function exception does not apply here.") (FTCA claims based on the California tort of false arrest also adequately alleged arrest in violation of the Constitution, so discretionary function exception not applicable); *see also Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (reversing district court's dismissal of FTCA's claims based on discretionary function exception where plaintiff alleged she was unlawfully stopped, arrested and searched by federal agents during her trip from Canada to the Los Angeles

International Airport and that the officers' actions were motivated by her race.). Thus, in light of *Galvin*, the discretionary function exception is not applicable if the government actor's conduct alleged as a tort is also a constitutional violation. *Galvin*, 374 F.3d 757-58.

### B.    Standards for Rule 12(b)(1) Motion in this Context

The government's discretionary function motion is a challenge to this Court's subject matter jurisdiction under Rule 12(b)(1), and is an issue on which the government bears the burden of proof. *See Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992). The standards that must be applied in ruling on a motion to dismiss vary according to the nature of the jurisdictional challenge. *Noel v. United States*, 893 F.Supp. 1410, 1416 (N.D. Cal. 1995).

In general, a court is free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary. *Augustine v. United States*, 704 F.2d 1074 (9th Cir. 1983). In such circumstances, "[n]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Thornhill Publishing Co. v. General Telephone Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). "However, where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, *the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits* or at trial." *Augustine*, 704 F.2d at 1077 (citing *Thornhill*, 594 F.2d at 733-35) (emphasis added).

"In ruling on a jurisdictional motion involving factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment, as a resolution of the jurisdictional facts is akin to a decision on the merits." *Id.* "Therefore, the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. Unless that standard is met, the jurisdictional facts must be determined at trial by the trier of fact."

*Id.*

## III.    The Motion to Dismiss Should be Denied as Premature

The factual assertions on which Defendant's motion relies go to the heart of the merits of this case.   In essence, the merits of this case boil down to resolving the following factual dispute:

As Plaintiffs allege, did a CBP officer or officers by threats, intimidation and coercion of two American children of Mexican descent elicit their false confessions that one was a noncitizen imposter, and the other her trafficker, causing their unlawful prolonged detention and separation from their mother without probable cause or lawful justification?

Or as Defendant alleges, was "[t]he length of detention in this case… due to the statements of J.A.M. and O.A.M., from the outset and throughout the process, that J.A.M. was a noncitizen imposter[?]"  Def. Mtn. to Dismiss, ECF No. 4 at 18.

Defendant's oft-repeated assertion that the discretionary function exception applies here because "[f]rom the outset and throughout the process, J.A.M. and O.A.M. asserted that J.A.M. was a noncitizen imposter," reflects the complete overlap between Defendant's jurisdictional challenge and the merits of this case.  Def. Mtn. to Dismiss, ECF No. 4 at 7, 12, 18, and 22.  Thus, "the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, [so] *the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits* or at trial." *Augustine*, 704 F.2d at 1077 (citing *Thornhill*, 594 F.2d at 733-35) (emphasis added).

At minimum, before addressing a motion on the merits, Plaintiff should be afforded an opportunity to conduct *some* discovery of the facts and circumstances of the questioning of 9-year-old J.A.M. and 14-year-old O.A.M. beyond the two threadbare declarations set forth in Defendant's Motion to Dismiss.  *See Burlington N. Santa Fe R.R. Co. v. The Assiniboine & Sioux Tribes of the Fort Peck Reservation*, 323 F.3d 767, 773-74 (9th Cir. 2003) (in the absence of "any realistic opportunity to pursue discovery

relating to [Plaintiffs'] theory of the case, [the Court] should grant any Rule 56[(d)] motion fairly freely."); *see also* Plaintiff's Ex Parte Rule 56(d) Motion and Declaration filed June 15, 2022, ECF No. 10.

At this early stage, the government's jurisdictional challenge premised on the merits of the case should be denied as PREMATURE.

**IV.    The Discretionary Function Exception Does Not Shield the Government's Unconstitutional Actions**

Plaintiffs claims are not barred by the FTCA's discretionary function exception ("DFE"). The DFE applies only where the government shows that actions that gave rise to FTCA claims *both* (1) involved an element of judgment or choice, *and* (2) were based on considerations of public policy. *Gaubert*, 499 U.S. at 322-23; *Nanouk v. United States*, 974 F.3d 941, 944 (9th Cir. 2020) ("The government bears the burden of establishing that the [DFE] applies."). The exception cannot shield the government where its actions violate the Constitution. *Fazaga v. F.B.I.*, 965 F.3d 1015, 1065 (9th Cir. 2020) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply.") (quoting *Galvin*, 374 F.3d 739, 758 (9th Cir. 2004)). Here, the discretionary function exception does not apply because the government's misconduct violated the Constitution.

Plaintiffs have alleged in detail how CBP Officers by threats, intimidation and coercion of two American children of Mexican descent elicited their false confessions that one was a noncitizen imposter and the other was her trafficker, causing their unlawful prolonged detention and separation from their mother without probable cause or lawful justification in violation of the Fourth Amendment right to be free from unreasonable seizures, the Fifth Amendment due process rights to family integrity and family association, and the Fifth Amendment right to equal protection and to be free of adverse treatment based on discriminatory animus because according to a CBP officer the 9-year-

old American girl "looked Honduran."[2]   Complaint, ECF No. 1 at ¶¶ 13-37, 53-72.

The government responds to Plaintiffs' claim of a Fourth Amendment violation by simply doubling-down on their unsupported assertion that "[t]he length of detention in this case was due to the statements of J.A.M. and O.A.M., *from the outset and throughout the process*, that J.AM. was a noncitizen imposter."   MTD, ECF No. 4 at 18.   The government also points to the children's failure to identify and distinguish the actions of each complicit CBP officer in secondary inspection or the AEU.   *Id.* ("Plaintiffs do not dispute anywhere in their Complaint the actions of CBP officers in secondary inspection to refer J.A.M. and O.A.M. to the AEU.  Their allegations that CBP officers in the AEU used interrogation techniques to wear them down and extract false confessions are both implausible and demonstrably false.").  In fact, the government's reliance on policies and procedures applicable to the AEU is misplaced, as the coercive interrogations of the minor children eliciting their false confessions appear to have occurred or at least begun in the secondary inspection area by CBP Officer Willmy Lara, as evidenced by the documents and declarations attached to Defendant's Motion to Dismiss, and explained in further detail below.

The government argues, "J.A.M. and O.A.M. had already stated that J.A.M. was an imposter who was born in Tijuana when they were in secondary inspection, *within minutes of being referred there*…"  MTD, ECF No. 4 at 18.  The government presents a timeline in its Statement of Background and Material Facts, suggesting that "At about *7:30 a.m.,* J.A.M. and O.A.M. applied for admission at the Pedestrian West facility of the port of entry," and by *7:40 a.m.*, they were referred to the AEU *after* already independently telling CBPO Lara in secondary inspection that J.A.M. was a noncitizen

---

[2] Notwithstanding a holding that a *Bivens* remedy is unavailable against the individual Doe Defendants, the Complaint still sufficiently alleges constitutional violations for the purposes of defeating the DFE.  *See Plascencia v. United States*, No. 17-cv-2515, 2008 WL 6133713, at *9, *14 (C.D. Cal. May 25, 2018) (finding DFE did not apply to constitutional violations, independent of analysis of *Bivens* claims).

imposter.  ECF No. 4-4 at ¶¶ 3, 10, 11.  According to the government, any suggestion that J.A.M. and O.A.M. were subject to lengthy interrogations that eventually broke the children by threats, intimidation and coercion resulting in their false confessions is "both implausible and demonstrably false," because no such coercive interrogation tactics could be successfully deployed within ten minutes when they were referred out of secondary inspection to the AEU at 7:40 a.m.  ECF No. 4 at 18.

However, it is the government's theory and bare factual declarations that are both implausible and demonstrably false, as evidenced by the CBP's own internal documents submitted in support of the motion.  It is undisputed that O.A.M. and J.A.M. arrived at the primary pedestrian lanes around 7:30 a.m. and were referred to secondary inspection.  *See* Report of Primary Inspector Viger, ECF No. 4-1 at 2.  However, the gap between the 7:30 a.m. referral to secondary inspection and the screening of O.A.M. and J.A.M. at the AEU "at approximately 1700 hours" according to the nearly contemporaneous report of CBP Officer J.C. Corrales leaves an unaccounted for gap of over *nine* hours.  Report of CBP Officer Corrales, ECF No. 4-1 at 8.

The suggestion that O.A.M. and J.A.M. blurted out that J.A.M. was a noncitizen imposter before being referred to the AEU "at about 7:40 a.m.," *see* ECF No. 4-4 at ¶¶ 10-11, is further contradicted by the contemporaneous report of CBP Officer Vincent, who escorted O.A.M. and J.A.M. to secondary inspection and saw where CBP Officer Lara subjected them to *lengthy* interrogations *before* turning them over to the AEU:

> CBPO W. Lara separated [J.A.M.] and [O.A.M.].  I noticed CBPO W. Lara begin to interview them in the Spanish language.  After a *lengthy* interview, [J.A.M.] and [O.A.M.] separately admitted the same story.  Both subjects separately admitted [O.A.M.]'s real sister was the true owner of the U.S. passport card.  Both subjects separately admitted they decided to use the passport card to smuggle [J.A.M.] into the United States because she looked very similar to her cousin who was the true owner of the document.  [O.A.M.] and [J.A.M.] was then turned over to the Admissibility Enforcement Unit (AEU).

Report of CBP Officer Vincent, ECF No. 4-1 at 6 (emphasis added).

Thus, a detailed review of the contemporaneous reports submitted by the

government in their opposition support rather than contradict Plaintiffs' allegations that O.A.M. and J.A.M. were subjected to lengthy interrogations before breaking down under threats, intimidation and coercion to falsely confess that 9-year-old J.A.M. was a noncitizen imposter and O.A.M. was trafficking her.  Notably, even CBP Officer Lara's own recent declaration prepared in support of this *instant* motion does not dispute the Complaint's allegations of threats, intimidation and coercion that resulted in the false confessions of J.A.M. and O.A.M.  Declaration of CBP Officer Lara.  ECF No. 4-2 at 1, 2.

The Complaint's factual allegations establishing violations of Plaintiffs' Fourth and Fifth Amendment rights are not reasonably in dispute based on the government's proffered declarations and documents.  The government's mischaracterization and exaggeration of its own proffered evidence does not meet its initial burden of establishing any reasonably disputed facts regarding the constitutional violations set forth in the Complaint.  As such, the government has not met its burden of establishing that the DFE applies, because it has failed to proffer any evidence establishing a reasonable dispute of fact regarding the violations of Plaintiffs' Fourth Amendment right to be free from unreasonable seizures, the Fifth Amendment due process rights to family integrity and family association, and the Fifth Amendment right to equal protection and to be free of adverse treatment based on discriminatory animus because according to a CBP officer the 9-year-old American girl "looked Honduran."  To the contrary, based on its own proffered evidence, as detailed above, the government has revealed further evidentiary support for the constitutional violations of Plaintiffs' Fourth and Fifth Amendment rights.

Much the way the government's motion to dismiss rather shockingly and offensively suggests that J.A.M.'s own U.S. Citizenship status is still subject to any reasonable dispute, *compare* Motion to Dismiss, ECF No. 4 at 6 fn. 1 (refusing to acknowledge that the minor child, J.A.M., was in fact a U.S. citizen) *with* Report of CBP Officer J.C. Corrales, dated March 19, 2019, ECF No. 4-1 at 9 ("After further review minor child was determined to be a *U.S. citizen* and was reunited with *mother*…"), the

government's strained reading of the proffered declarations and documents fails to meet its initial burden of establishing the applicability of the discretionary function exception. *Prescott v. United States*, 973 F.2d 696, 701-03 (9th Cir. 1992) (stating that is it is government's burden to show all elements of FTCA exception).  Accordingly, the motion to dismiss based on the discretionary function exception should be denied.

## V.    Request for Leave to Amend

Should the Court grant the government's motion, Plaintiff requests leave to amend the complaint to address any deficiencies.  *See Moss v. U.S. Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009) (stating that "requests for leave [to amend] should be granted with extreme liberality") (citation and quotation marks omitted).

## VI.    Request for Leave to Conduct Discovery Regarding the Facts and Circumstances of the Interrogation of the Minor Plaintiffs, including Transcripts and Recordings of the Interrogations

Without an opportunity to obtain this information in discovery, Plaintiffs are unable to fully present the facts and circumstances of the interrogations of 14-year-old O.A.M. and 9-year-old J.A.M. resulting in their coerced false confessions to J.A.M. being an undocumented imposter and O.A.M. to being her trafficker.  In light of the merits of the constitutional claims being intertwined with the jurisdiction challenge, these facts and circumstances are essential to Plaintiffs' opposition to the motion to dismiss, which urges the Court to find Plaintiffs' allegations about coerced false confessions to be "both implausible and demonstrably false."

Furthermore, transcripts and recordings of the interrogations likely exist. According to the Department of Homeland Security's (DHS) Office for Civil Rights & Civil Liberties (CRCL) Complaint Closure Without Recommendations report submitted by the government, *see* ECF No. 4-1 at 20, DHS received a detailed complaint only two weeks after the incident from the American Friends Service Committee on behalf of Plaintiffs.  CRCL opened an investigation and sent a request for records from CBP on May 7, 2019, which included among other things "transcripts from interviews with the

two children." ECF No. 4-1 at 20. As Plaintiffs' counsel is unaware of CBP staffing court reporters at the SYPOE, on information and belief those transcripts were generated from audio or audiovisual recordings of the children. In light of the almost immediate complaint to DHS, and the ensuing investigation, the recordings certainly should have been preserved. To date, Plaintiffs have had no opportunity to conduct any discovery, and have not otherwise received the transcripts or recordings of the interrogations of O.A.M. and J.A.M.

Accordingly, the intertwined nature of this jurisdictional challenge and the merits of the case warrant relief under Rule 56(d) to defer ruling on this factual merits motion, and is hereby requested based on the declaration of undersigned counsel attached to the Plaintiffs' *Ex Parte* Rule 56(d) Application, filed June 15, 2022. ECF No. 10-2. In the absence of "any realistic opportunity to pursue discovery relating to [Plaintiffs'] theory of the case, [the Court] should grant any Rule 56[(d)] motion fairly freely." *Burlington N. Santa Fe R.R. Co. v. The Assiniboine & Sioux Tribes of the Fort Peck Reservation*, 323 F.3d 767, 773-74 (9th Cir. 2003). At this stage, the parties have not engaged in any discovery, as the ENE, the CMC, the Rule 26(f) conference, and the parties exchange of initial disclosures have yet to occur. Accordingly, the motion to dismiss should be denied as PREMATURE or deferred until after Plaintiff has had some opportunity to conduct discovery regarding the facts and circumstances of the interrogations of the children Plaintiffs.

## VI.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the government's motion as PREMATURE given that the merits of the jurisdictional challenge (i.e., whether the discretionary function exception applies because the government conduct did not violate the Fourth and Fifth Amendment) is intertwined with the merits of the case (i.e., whether the government conduct resulted in false imprisonment, intentional infliction of emotional distress, negligence, and violations of the Fourth and Fifth Amendment), and Plaintiffs have thus far had no opportunity to

conduct *any* discovery in this case.

In the alternative, Plaintiffs request that the Court deny the motion on the merits, as the government has failed to meet its burden of establishing the application of the discretionary function exception with its proffered evidence, which falls far short of proving that the government conduct did not violate the Constitution.

To the extent the motion is granted, Plaintiffs respectfully request that they be given leave to amend the Complaint to address any deficiencies.

Respectfully submitted,

Dated:  June 20, 2022                          */s/ Joseph M. McMullen*
                                               Joseph M. McMullen
                                               Attorney for Plaintiffs