# APPENDIX A:

Excerpts of *Al Otro Lado, Inc. v. Nielsen*, Case No. 3:17-cv-02366-BAS-KSC, Doc. No. 148, I.B., fn.15, III.A (S.D. Cal. Sept. 17, 2018) (describing AEU components of SYPOE surveillance system)

**AL OTRO LADO, INC., et al., Plaintiffs,**

v.

**KIRSTJEN NIELSEN, Secretary, U.S. Department of Homeland Security, in her official capacity, et al., Defendants.**

Case No. 3:7-cv-02366-BAS-KSC.

**United States District Court, S.D. California.**

September 17, 2018.

Al Otro Lado, Inc., a California corporation, Abigail Doe, individually and on behalf of all others similarly situated, Beatrice Doe, individually and on behalf of all others similarly situated, Carolina Doe, individually and on behalf of all others similarly situated, Dinora Doe, individually and on behalf of all others similarly situated, Ingrid Doe, individually and on behalf of all others similarly situated & Jose Doe, individually and on behalf of all others similarly situated, Plaintiffs, represented by Michaela R. Laird, Latham & Wakins, LLP, Robin Kelley, Latham & Watkins LLP, Angelo R. Guisado, Center for Constitution Rights, pro hac vice, Baher Azmy, The Center for Constitution Rights, pro hac vice, Faraz R. Mohammadi, Latham & Watkins LLP, Ghita R. Schwarz, Center for Constitution Rights, pro hac vice, Karolina J. Walters, American Immigration Council, pro hac vice, Kathryn E. Shepherd, American Immigration Council, pro hac vice, Melissa E. Crow, American Immigration Council, pro hac vice, Wayne S. Flick, Latham and Watkins LLP & Manuel A. Abascal, Latham & Watkins LLP.

Kevin K. McAleenan, Acting Commissioner, United States Customs and Border Protection, in his official capacity & Todd C. Owen, Executive Assistant Commissioner, Office of Field Operations, United States Customs and Border Protection, in his official capacity, Defendants, represented by Alexander James Halaska, U.S. Department of Justice, Gisela Ann Westwater, US Department of Justice, Brian Ward, U.S. Department of Justice, Danielle K. Schuessler, Civil Division - Office of Immigration Litigation, Genevieve Kelly, Genevieve M. Kelly, US Department of Justice, Sairah G. Saeed, USDOJ Civil Division - Office of Immigration Litigation & Yamileth G. Davila, United States Department of Justice.

Kirstjen Nielsen, Acting Secretary, U.S. Departmernt of Homeland Security, Defendant, represented by Alexander James Halaska, U.S. Department of Justice, Gisela Ann Westwater, US Department of Justice, Brian Ward, U.S. Department of Justice, Danielle K. Schuessler, Civil Division - Office of Immigration Litigation, Genevieve M. Kelly, US Department of Justice, Sairah G. Saeed, USDOJ Civil Division - Office of Immigration Litigation & Yamileth G. Davila, United States Department of Justice.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PROTECTIVE ORDER

## [Doc. No. 148]

KAREN S. CRAWFORD, Magistrate Judge.

Presently before the Court is a Motion for a Protective Order sought by the defendants regarding their preservation obligations of video and audio data collected at multiple Ports of Entry ("POE") along the Southwest border by the U.S. Customs and Border Patrol ("CBP"). For the reasons explained in greater detail below, defendants' Motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

## A. Factual Background

The individual plaintiffs in this case are non-U.S. citizens who allege they were denied access to the asylum process in the United States because of defendants' policies, practices, and procedures for handling individuals that present themselves at POEs along the U.S.-Mexico border. [Doc. No. 1 at pp. 1-2]. The individual plaintiffs seek asylum in the United States due to fears of death or physical injury in their home countries, Mexico and Honduras, which they attribute to gang violence, drug cartels, and, in some cases, severe domestic violence. Plaintiff, Al Otro Lado, Inc., is an organization alleging that defendants' unlawful policies, practices, and procedures have forced it to divert substantial resources from other efforts to counteract defendants' alleged wrongful actions. [*Id.* at p. 4].

This case was filed as a class action. No class has yet been certified nor has a motion for class certification been filed since the case was transferred from the Central District of California to the Southern District of California. [Doc. No. 1]. The named plaintiffs, proceeding pseudonymously [Doc. No. 138], allegedly presented themselves to CBP officials at the San Ysidro and Otay Mesa, California, and Laredo, Texas ports of entry. [Doc. No. 1]. They seek to represent a class of asylum seekers who they allege were also denied appropriate access to the asylum process along the entire U.S.-Mexico border.

Before defendants' Motion to Transfer Venue was granted by the U.S. District Court for the Central District of California [Doc. No. 113] on November 21, 2017, the parties filed a Joint Rule 26(f) Report [Doc. No. 83]. Initial disclosures were exchanged in late October, 2017 [*Id.* at p. 5], and an initial round of requests for production of documents and responses thereto were exchanged. [*Id.* at pp. 5-6]. This Court stayed discovery on January 31, 2018. [Doc. No. 144]. The instant dispute was filed as a Joint Motion on February 20, 2018. [Doc. No. 148]. Therein, defendants informed the Court that the dispute required speedy resolution due to an imminently scheduled technological infrastructure event that would result in the permanent *deletion of all currently stored video and audio data on the San Ysidro POE surveillance system.* [1] That Electronically Stored Information ("ESI") deletion forms the basis of the instant dispute. The Court held a hearing on the Joint Motion on February 28, 2018. [Doc. No. 150]. At the conclusion of the hearing, the Court issued an Order staying the scheduled technological infrastructure event described by defendants as the "transition" of the San Ysidro POE to the Centralized Video Surveillance System ("CAVSS"), pending a ruling by this Court on the instant Motion. [Doc. No. 153]. On March 9, 2018, defendants filed Supplemental Briefing as ordered to address the questions posed by the Court during the hearing. [Doc. Nos. 156, 161].

## B. Technological Infrastructure of CBP Surveillance Systems

For a better understanding of the respective arguments of the parties, a brief summary of the surveillance system infrastructure at CBP POEs is appropriate.

Any video or audio data recorded by CBP under its current system begins with multiple cameras and microphones positioned throughout POE facilities. *[See, e.g.,* Doc. No. 148-22, Decl. of Adrian C. Guerra]. Some cameras are associated with microphones, while some microphones are free standing, recording audio not *directly* tied to a specific camera. [Doc. No. 148]. All such data is recorded to either Digital Video Recorders ("DVRs") or Network Video Recorders ("NVRs"). No hardware-specific differences between these devices have been communicated to the Court other than the representation that, "[i]n general, DVRs have smaller hard drives than NVRs, and so are generally capable of storing a smaller quantity of data." [Doc. No. 148-18 at p. 4, Decl. of Heather M. Robinson]. For this reason — and because NVRs have the added benefit of remote access and updating as discussed below — NVRs are preferred, and CBP is working across POEs to replace DVRs with NVRs where possible. [*Id.*]. CBP is in the process of implementing its preferred means of surveillance data management nationally through the Centralized Video Surveillance System ("CAVSS") at the San Ysidro POE, an "enterprise-wide program that is intended to be the fixed facility surveillance solution for the agency."[2] [*Id.* at p. 2]. A fully operational CAVSS system at a POE includes DVRs, NVRs, viewing monitors, computer workstations, storage devices (e.g., DVDs, CDs, hard drives, and other storage devices), and specialized software (such as the Video Management Software ("VMS") used to review and then archive

data for longer-term preservation). [*Id.*]. Importantly, CAVSS permits CBP officials "to centrally and remotely maintain" NVRs on the system, allowing CBP to swiftly address cybersecurity vulnerabilities. [*Id.* at p. 8]. Some POEs have already been partially integrated into CAVSS, while others have not. [*Id.*].

For those surveillance systems already on CAVSS, the aim is to preserve video and audio data for 90 days before it is overwritten. [*Id.* at p. 4]. The overall tenor of CBP's briefing suggests that it is more common for cameras to begin overwriting video sooner than the 90 day standard. Some cameras begin overwriting in less than thirty days, while others might not begin overwriting for nearly 700 days.[3] [Doc. No. 148-22, Decl. of Adrian C. Guerra]. The more movement in a camera field of view, the more data it records, the more quickly the allocated storage is filled, and thus the more quickly overwriting occurs. [Doc. No. 148-16 at p. 4]. As a result, cameras that pan, zoom, or focus on areas of high traffic will capture more data per second of video than fixed cameras, or cameras in less trafficked areas. [*Id.*]. In sum, regardless of whether a surveillance system in its entirety, some portion, or no portion has been integrated into CAVSS, the quantity of data preserved at a POE may vary substantially. *[See* Doc. Nos. 148-16, 148-22, 148-23, 148-24, 148-25]. This is true of the San Ysidro POE in its current, non-CAVSS integrated state.

Because all data is eventually overwritten, CBP personnel can choose to retrieve relevant video or audio data to "archive" specific, identifiable incidents. [Doc. No. 148-16 at p. 6]. The most common storage method appears to be DVDs, however personnel also use external hard drives. [Doc. Nos. 148-16, 148-22, 148-23, 148-25]. Archives are for a "specific" and "abbreviated" time period, commonly referred to as an "incident." "Incidents" are "identified, archived, and preserved as soon as possible after their occurrence." [Doc. No. 148 at p. 12]. This process is "labor and resource-intensive" so CBP personnel at the Laredo Field Office, for example, find it neither "practical [n]or necessary to preserve all footage. . ." [Doc. No. 148-22 at p. 4]. CBP "does not generally have the resources to indefinitely archive all video data." [Doc. No. 148-16 at p. 6].

Counsel for the government took great pains at the hearing to impress upon the Court that "the system is designed for incident-specific archiving" and that CBP does not ever contemplate holding on to, for example, "a whole day of video." [Doc. No. 157 at p. 10]. This point is reiterated in its Supplemental Brief when CBP writes "[d]efendants' technical infrastructure is only able to support archiving of specific incidents such as alleged defined crimes or a specific altercation." [Doc. No. 156 at p. 4]. Implicit in defendants' statements is that retention of surveillance data beyond a narrow, time-bounded "incident" is possible, but exceeds CBP's current practices and available data storage infrastructure.[4]

To reiterate, CBP's practice is to save only a small amount of data (i.e., specific incidents as needed) to a DVD, CD, or external hard drive. [Doc. Nos. 148-16, 148-22, 148-23, 148-25]. CBP did not provide the typical costs incurred by the agency for preserving limited "incidents" in its normal course of operations. CBP also did not provide the costs associated with retaining the surveillance data that it has already agreed to preserve and produce for purposes of this lawsuit. CBP continues to maintain that the only feasible way to satisfy plaintiff's preservation requests is to preserve *all* surveillance ESI currently stored to date at the San Ysidro POE. [Doc. No. 161 at pp. 11-12].[5]

In support of its description of the burden imposed when identifying and preserving electronic data for specific incidents, CBP provided contradictory explanations and declarations. The Declaration of Mr. Adrian C. Guerra, Program Manager for Border Security at the Laredo Field Office states the following, rough, rule of thumb:

> [I]n my experience, when an incident has been identified as requiring preservation, the process can take as many man hours to complete as the time period provided to identify the incident . . . . For example, if a window of 3 hours is provided with a general description of the individual involved, and a specific POE in which the even occurred, it could take up to 3 hours to identify the relevant data . . . . Having as much information about an event as possible — [like] date, time and location of event, a relevant date of birth, alien number, and description — makes identifying the relevant data much more efficient and potentially near instantaneous.

[Doc. No. 148-22 at p. 5-6]. The more detailed the identifying information given to CBP personnel, the faster an incident

viable basis for objection. Nor does a data management system that regularly overwrites information in the normal course of operation excuse a party from fulfilling their duty to preserve documents and information.

Emphasizing the "incident specific" nature of CBP surveillance systems dovetails with defendants' most frequently used argument against preservation: to construe every request by plaintiffs to require "wholesale preservation" of *all* existing ESI on CBP NVRs and DVRs across a single POE, or every POE. [Doc. No. 148 at p. 21]. For example, defendants assert that plaintiffs' requests for 45 days' notice to bring an incident to their attention, *and* to preserve surveillance data of individuals withdrawing their applications for admission would require the "wholesale preservation" of all surveillance ESI at the entire San Ysidro POE. [*Id.* at 21]. This Court acknowledges that holding onto every second of video at a POE may, indeed, be over-burdensome. Recognizing that, the Court sought at the discovery hearing to strike a balance, and asked defendants how the quantity of preserved ESI could be tailored to reduce the amount of ESI subject to preservation, and perhaps later, production:

> Court: And has the . . . government identified which specific cameras and microphones within the two locations at San Ysidro, mainly Ped West and AEU, might have relevant recorded interactions between plaintiffs — potential plaintiffs and CBP?
>
> I mean, the Robertson declaration points out the tremendous costs associated with archiving and how much data is at issue at the port in general. I'd like to know whether there are any specific cameras and microphones that are at issue that really would contain the infoimation which is relevant to this case. Do you know the answer to that?
>
> Ms. Saeed: We — we have retained video of all named plaintiffs at this time. I think we would have to — we would have to . . . check into that.
>
> Court: Alright. So that's another thing I need to know, the specific cameras and microphones that are most likely to have relevant recorded interactions between the named plaintiffs and any potential plaintiffs, which obviously would be coming through the same entry spots, and where those cameras and microphones are located. And I'm asking specifically now for San Ysidro.

[Doc. No. 157 at pp. 33-35]. The Court recognizes, as it did at the hearing, that it is unlikely a single camera or microphone would record *all* relevant data. Hence the request for more narrowly drawn preservation options. Despite the Court's request for this specific information, the defendants doubled down in their Supplemental Briefing and accompanying declarations, continuing to assert an all or nothing approach, thereby ignoring this Court's specific request for this infoimation that might allow for the issuance of a tailored, more cost-effective solution.[15] [See Doc. No. 161 at p. 11 citing Doc. No. 148-15].

There are 207 cameras and 55 microphones recording to 20 NVRs at the San Ysidro Ped West and AEU facilities. [*Id.* at p. 10]. As previously addressed, some cameras are affiliated with microphones while others are not. *[See, e.g.,* Doc No. 148-22]. Given the allegations in the Complaint, cameras paired with microphones would likely be the most valuable as they would record conversations between asylum seekers and CBP personnel. Perhaps the preservation of recorded video from a limited number cameras would provide a bird's eye view of the interior region where interactions at issue occur. Those recordings conceivably could be coupled with audio recordings to preserve the relevant incident(s). Further, while the surveillance system functions 24/7, one might inquire whether a greater number of persons flow through the facilities during the daytime hours than at night. These are the kinds of line-drawing efforts the Court expected defendants to address in order to find a reasonable preservation solution. Defendants failed, without any satisfactory explanation, to provide this information, or otherwise engage in meaningful meet and confer efforts on this issue as required by this Court. *See* Judge Crawford Chambers' Rules, V(B).

Defendants also miss the mark when characterizing all CBP surveillance data they would prefer not to produce as "inaccessible." For example, defendants' state that "video of any identifiable individuals within 45 days of all southern land border POEs, as well as video capturing lines in Mexico at the San Ysidro POE is an *inaccessible source of ESI* that defendants should not have to preserve or produce." [Doc. No. 148 at pp. 39-42 (emphasis added)]. They assert

misunderstanding lies with defendants for their failure to provide such detailed information, even following inquiry from this Court.

[14] Larger scale preservation is undertaken by CBP only when "required for some evidentiary or operational reason." [Doc. No. 161 at p. 1]. In fact, seven months of surveillance data at the San Ysidro POE was preserved by CBP for just such an unknown, unexplained, and undefined "operational reason", and is *exactly* the type of data plaintiffs' request be preserved. (*see* Section II, *infra*). Given CBP has preserved such quantities of data before, the Court is forced to conclude — whatever CBP has asserted to the contrary — that its reluctance to preserve identical information in this case is the product of preference and unwillingness to incur the associated costs, not capability.

[15] This is not the only example of explicit requests by the Court for which defendants provided either insufficiently detailed answers or no meaningful response at all. Some of the questions listed below, the Court understands, do not align perfectly with the on-the-ground realities. Nonetheless, and as the Court explained, *supra,* the government is obligated to provide sufficient detail so a reasonable determination can be articulated by the Court. Below are some of the questions for which either no, or unsatisfactory, answers were provided by the government:

Court: [W]hat I'm thinking about is any location where there would be direct — where there's an opportunity for an asylum applicant to have any direct contact with an officer.

Ms. Saeed: We'll have to — we'll have to look into that.

Court: Okay. And I do see paragraph 15 of the Robertson declaration talks about 162 cameras and 31 microphones at Ped West, and 45 cameras and 24 microphones at AEU. I don't know how many of those pertain to the actual interview area where there would be direct interaction, but if you could clarify that, that would be helpful.

[Doc. No. 157 at pp. 36-37].

. . .

Court: Okay. And you see — I mean, if we are talking about a more concise group of cameras, then that — that cost may be less if it — if it can be segregated. And I don't know if it can.

Ms. Saeed: I think part of the issue is that there are a lot of different people coming through these areas, including legal permanent residents, U.S. citizens, so it's kind of hard to segregate, and that this would be an extremely burdensome cost for the government. Even if the cost was reduced . . .

Court: I'm just trying to get a better understanding of what the circumstances are, and there's a lot of generalities in the declaration, which is why I'm asking for specifics.

But it may be that that cost relates to a much broader scope of information than is actually necessary. In other words, if there are just specific cameras that are used when there's interaction with asylum seekers that may be, you know, cameras 10 through 20 out of 200 cameras, which may be a much more succinct and limited amount of data.

[*Id.* at pp. 37-39].

. . .

Court: You're still not answering my question, and the declarations don't address it. What I want you to find out is, are there certain locations where the asylum — where interaction with the asylum applicants take place, and if there are, I want to know what cameras are controlled or are geared and relevant to those particular locations.

[*Id.* at p. 40].

[16] Defendants fails to define "operational reasons", nor do they explain why they were able to retain such a large amount of data for their own purposes while arguing that the preservation of similar ESI requested by plaintiffs is "inaccessible." If the data is "inaccessible" because it is too costly to preserve, defendants again fail to explain why the cost was justified then for their own "operational reasons", but not now when plaintiffs request the same information for a different time period.

[17] The Complaint was filed in July, 2017. [Doc. No. 1].

[18] The Court disputes, however, defendants' assertions that this request would require it to preserve "100% of all NVR and DVR recordings." [Doc. No. 148 at p. 43]. Further, defendants do not explain why such a course of action was reasonable for the October 28, 2016 to June 8, 2017 time period, for which CBP voluntarily retained near-identitcal ESI for "operational reasons," but is over-burdensome for a more limited time period requested by plaintiffs.