1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11  J.A.M., a minor child; O.A.M., a minor       Case No.:  22-cv-380-GPC-BGS
    child; and THELMA MEDINA
12  NAVARRO, their mother,                       **MEMORANDUM DECISION AND**
                                                 **ORDER FOR ENTRY OF**
13                           Plaintiffs,         **JUDGMENT**

14  v.

15  UNITED STATES OF AMERICA, et al.,

16                           Defendant.

17

18        Julia and Oscar,[1] by and through their mother and guardian Thelma Medina

19  Navarro ("the Children"), and Thelma Medina Navarro ("Thelma") (collectively

20  "Plaintiffs") sue the United States of America ("Defendant" or "the United States") for

21  emotional injuries sustained during the U.S. Customs & Border Protection ("CBP")

22  detention of the Children at the San Ysidro Port of Entry ("SYPOE").  Both Children are

23  U.S. citizens and presented their valid U.S. passport cards when attempting to cross the

24

25  _____

26  [1] Although the Children's full names were used at trial, the Court will use only their first
    names in this decision because they were both minors at the time of incident.
27
28

border into the U.S., but Julia was detained for approximately 34 hours and Oscar for about 14 hours.  Plaintiffs assert the United States is liable under the Federal Tort Claims Act ("FTCA") for false imprisonment, intentional infliction of emotional distress, and negligence.[2]  A bench trial was held starting on March 19, 2024, with closing arguments delivered on March 22, 2024.  ECF Nos. 51-54.

Having carefully reviewed the evidence and the arguments of the parties, as presented at trial, and in their written submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule ("Rule") of Civil Procedure 52(a) and finds in favor of Plaintiffs on each cause of action.

## FINDINGS OF FACT[3]

Julia and Oscar are siblings born in the U.S. and are U.S. citizens.  ECF No. 59 at 46; ECF No. 57 at 47.  In March of 2019, Julia was 9-years-old and attending fourth grade at an elementary school in San Ysidro, California, a city in the U.S. just across the U.S.-Mexico border.  ECF No. 59 at 54; ECF No. 60 at 47.  Oscar was 14-years-old and attending ninth grade at a high school in San Ysidro, California.  ECF No. 59 at 45-46.  The Children lived with their parents and siblings in Tijuana, Mexico, the city immediately across from San Ysidro on the Mexican side of the U.S.-Mexico border.  ECF No. 59 at 46; ECF No. 60 at 46-47.  Their mother, Thelma, is a Mexican citizen, but possessed a valid U.S. Border Crossing Card.  ECF No. 60 at 49-50.  Their father does not have the legal status or a visa to enter the U.S.  *Id.* at 59.  Like many U.S. citizen

---

[2] Plaintiffs agreed not to pursue their claim for violations of California Civil Code section 52.1 ("the Bane Act").  ECF No. 49 at 2-3.

[3] In making the factual findings, the Court relies very little on the testimony of the Children.  Children are generally poor historians and both Oscar and Julia were impeached on a number of points.  Instead, the Court relies primarily on the testimony of the adults—though many of the officers had very little recollection of the particular events at issue and Thelma and some of the officers provided inconsistent testimony.

children living in Mexico in the San Diego-Tijuana metropolitan area, the Children rose early to cross the U.S.-Mexico border every morning to go to school.  ECF No. 59 at 49-53.

**I.     Primary Inspection**

On Monday, March 18, 2019, unaccompanied by an adult, the Children attempted to cross through the western pedestrian crossing at SYPOE, known as "PedWest." Initially, Michelle Cardenas, Julia's godmother, was going to drive Julia across with her own daughter, and Oscar was going to separately use the pedestrian crossing with Cardenas's son.  ECF No. 60 at 55; ECF No. 57 at 49-50.  Because the car line was too long, Cardenas asked Oscar and her son to pick up the girls from the car line and cross into the United States using the pedestrian crossing.  ECF No. 57 at 50-51.

At primary inspection—the encounter that all border crossers have at which they present their documents—CBP Officer Dennese Viger examined the Children's valid passport cards and noticed a dot on Julia's photo that appeared to be a mole on her upper lip, which was not visible on Julia in person.  ECF No. 62 at 8.  Two CBP officers testified at trial that there are sometimes irregularities on identification cards that do not reflect the person's appearance.  ECF No. 56 at 49, 117.  Julia also presented a school identification from her former elementary school in Mexico which did not reveal a mole, ECF No. 62 at 23-24; Ex. 120-A at 17 (USA-0190), but Officer Viger reported that the school ID did not resemble Julia, Ex. 16.  Officer Viger then asked some questions about Julia's crossing history, "to which Julia was not sure of."[4]  Ex. 16.  After briefly checking

---

[4] Officer Viger testified that she asked Julia if she had ever crossed by car and Julia said she had not, though her crossing history showed that she had crossed by car many times. ECF No. 62 at 9.  However, Officer Viger's detailed report, written only hours after the incident does not include this question and response so the Court is not convinced that Officer Viger asked this question and Julia answered it in this way.  *See* Ex. 16 ("I

with the "Lead" Officer Smith Vincent, Officer Viger referred the Children to secondary inspection at 7:39 a.m.  ECF No. 56 at 91-92; Ex. 16.

## II.  Secondary Inspection

Secondary inspection at PedWest is located just behind primary inspection in the same building.  *See* ECF No. 56 at 92.  While the Children waited in the secondary inspection intake/waiting area, Officer Vincent pulled CBP Officer Willmy Lara from primary inspection to conduct an interview of the Children.  ECF No. 56 at 93-94.  The officers in secondary chose Officer Lara because he had a reputation for obtaining confessions.  ECF No. 56 at 94 ("He is pretty skilled at interviewing travelers."); ECF No. 56 at 45 ("He was able to speak very well and get them to confess.").

Officer Lara briefly spoke with the Children in the waiting room, at which time they stated that they were siblings, Oscar and Julia.  ECF No. 57 at 56.  He or Officer Erick Melendrez, another CBP officer in secondary, asked Oscar when the two had last crossed together, and Oscar mistakenly answered incorrectly, not remembering exactly.  ECF No. 59 at 72, 187-88.  The crossing records for Julia disclosed dozens of crossings between January and March 2019, with repeated crossings in vehicles associated with Cardenas, Julia's godmother who had initially driven her to the border that day.  Ex. 35 at 1-4.  After brief questioning in the waiting area, Officer Lara brought Julia to a semi-private security office within secondary for an individual interview.  ECF No. 56 at 97; ECF No. 59 at 153.

CBP policy prohibits officers from interviewing a minor in a private area unless another officer is present to witness the interview.  ECF No. 59 at 171-72; ECF No. 56 at 104.  This is because, as Officer Lara observed, "minors get confused all the time" and

---

proceeded to ask Julia Amparo Medina questions about how often and where she usually crosses to which she was not sure of.").

"they get scared."  ECF No. 59 at 171.  Officer Lara testified that Officer Albert Avila and a third officer were present for the interview, ECF No. 59 at 154, 168, but Officer Lara's report makes no reference to any witnesses to the interview, Ex. 9.  Each of the other CBP officers in secondary that day—Smith Vincent, Erick Melendrez, and Albert Avila—testified that they did not remember a witness being present for the interview.[5] ECF No. 56 at 97, 103; ECF No. 56 at 31, 36; ECF No. 56 at 68, 70, 85-88 (Officer Avila was about 15 feet away and could not hear details). Lead Officer Vincent was unable to understand the Spanish-language interview and does not remember seeing any other officer witnessing the interview but did not take steps to ensure that there was a witness present.  ECF No. 56 at 103-04.  Though other officers could see part of the room, no one else was in the room or within clear listening distance and the interview was not audio or video recorded.  The Court finds that Officer Lara violated the CBP policy requiring a witness for interviews of children and otherwise failed to record the interview.

The parties dispute what happened in the interview.  Plaintiffs assert that Officer Lara came up with the idea that Julia was her cousin Melany, and then pressured Julia into agreeing.  *See, e.g.*, ECF No. 57 at 60.  The United States contends that Julia and Oscar stated that Julia was Melany unprompted and then continued to say that throughout their interviews.  ECF No. 47-4 at 2.  The United States does not offer a coherent explanation as to why Julia would falsely confess that she was her cousin Melany. Further, because Officer Lara failed to have a witness present and prepared a report lacking in details, *see* Ex. 9, there is no corroboration of either claim.

---

[5] Officer Vincent also testified that Officer Kim was working in secondary inspection that day, but the Court heard no other testimony regarding Officer Kim and no party or witness suggested that Officer Kim may have served as a witness for Officer Lara's interview with Julia.  ECF No. 56 at 95.  Officer Kim's first name was not mentioned during trial.

22-cv-380-GPC-BGS

1    At the very start of the 10 - 30 minute interview, Julia stated that her name was

2    Julia.  ECF No. 59 at 174; ECF No. 56 at 31-32.  Officer Lara testified that he asked Julia

3    about her school colors and what train she took in San Ysidro to get to school and that

4    she gave incorrect answers to those questions.  ECF No. 59 at 151-53.  However, in his

5    post-interview report, Officer Lara made no reference to any questions regarding school

6    colors or trains.  Ex. 9.  The cursory report provides little detail as to what happened

7    during the interview itself.[6]  *Id*.  The report states only that "I interviewed [Julia] about

8    her crossing history and her family member[s] and noticed inconsistencies on the names

9    and relationship to her.  [Julia] admitted that she had been using the passport card with

10   her cousin's name (true bearer of the document) to cross into the United States to go to

11   school."  *Id*.  The report does not identify any inconsistencies "on the names and

12   relationship to her."

13   Officer Lara's report makes no reference as to what prompted Julia to (falsely)

14   confess that she was Melany.  Ex. 9.  Officer Lara testified "it was just a normal

15   interview" and that he did not remember Julia crying during or after the interview.  ECF

16   No. 59 at 156, 176.  However, according to Julia, Oscar, and Officer Melendrez, Julia

17   was crying after the interview and Oscar consoled her.  ECF No. 56 at 34; ECF No. 59 at

18   89; ECF No. 57 at 62.  Additionally, at trial, Officer Lara testified with a confident and

19   intense manner.  Meanwhile, Julia was soft-spoken, easily confused by leading questions,

20   and prone to freezing up and unthinkingly agreeing with the questioner, resulting in

21   contradictory answers.

22   Officer Lara testified that during the interview he went in and out of the interview

23   room a few times to speak with Oscar and Officer Melendrez.   ECF No. 56 at 32; ECF

24

25   _____

26   [6] The lack of detail is in contrast to the report completed by primary Officer Viger, who
27   spent no more than a minute or two with the children but wrote a longer report.  Ex. 16.

28

22-cv-380-GPC-BGS

No. 59 at 77, 80.  Oscar confirmed that Officer Lara came out on three occasions and spoke with him or Officer Melendrez.  ECF No. 59 at 76, 81.  Oscar stated that Officer Melendrez asked him if he had any female cousins, and that he responded that he had three female cousins: Nicole, Natalie and Melany.  *Id*. at 77-78.  Oscar then saw Officers Lara and Melendrez interact.  *Id*. at 80.  Afterwards, Officer Lara approached Oscar and told him that the girl in the next room was not Julia, but rather, that she was his cousin Melany.  *Id*. at 81.  The Court finds that Officer Lara learned about Melany through the questioning of Oscar by Officer Melendrez.

Officer Melendrez testified that at some point during or after the interview Officer Lara told him that Julia admitted to being her cousin Melany, instead of Julia as listed on her passport card.  ECF No. 56 at 38; ECF No. 56 at 51 ("Q: Do you recall specifically when there was a report of a cousin named Melany? . . . A: I think the cousin didn't come through until Lara came out and said that she had confessed to that, I believe.").  Officer Melendrez's initial reaction was one of surprise and shock.  ECF No. 56 at 39.  Officer Melendrez had also been interviewing Oscar for a few minutes here and there during this time.  ECF No. 56 at 32.  But he did not remember Oscar saying or agreeing that Julia was his cousin.  ECF No. 56 at 39.  Officer Lara testified that Oscar separately admitted in response to his questioning in the waiting room that Julia was not the individual identified in the passport card but his cousin.  ECF No. 59 at 155, 184.  However, Officer Lara's report does not appear to state this, Ex. 9, though Officer Lara testified that he meant to convey it, ECF No. 59 at 181-82.  Nor does Officer Melendrez remember Officer Lara telling him that Oscar made such an admission.  ECF No. 56 at 39.

The evidence reveals that Julia was scared and extremely vulnerable at the time that she was referred to secondary inspection and during her interview.  The Court finds that Officer Lara, assuming that Julia was not who she said she was primarily because of the "mole" apparent on her passport card, erroneously concluded that Julia was Melany

and conducted his interrogation with that conclusion in mind.  Because there were no witnesses or recording of the interview, it is not possible to determine whether Julia was threatened, pressured, or coerced to make a false confession.  At the very least though, the Court finds that Officer Lara's intense manner in questioning a scared 9-year-old who was prone to freezing up and automatically agreeing when questioned by authority caused Julia to falsely admit that she was her cousin, Melany. Julia testified that she never stated that she was Melany, ECF No. 57 at 61, but the Court does not find this credible.  However, contrary to the government's argument, the Court finds that Oscar did not direct Julia to say that she was Melany in secondary inspection.

As a result of Officer Lara's interview and Julia's false confession, the secondary officers and supervisor concluded that Julia was lying about her identity and was actually her cousin Melany.  They testified that they suspected Oscar of smuggling or trafficking her.  ECF No. 56 at 123-24.  The officers did not attempt to call the Children's mother (or Melany's mother), even though they sometimes do so during investigations.  ECF No. 45 at 6, 13.  Nor did they attempt to look at Julia's passport application materials in the State Department database as a way to determine or verify her identity.  ECF No. 59 at 166-67.

Two other officers then fingerprinted the Children and completed an "Appendix D," which records biographical information.  Julia's Appendix D lists the name Melany, along with Melany's parents' names and Melany's birthdate with the wrong year.  ECF No. 56 at 71, 73, 77-78.  The supervisor then sent them to the Admissibility Enforcement Unit ("AEU").  The Children were at secondary for an hour and half to two and half hours, meaning that they were sent to the AEU between 9 - 10 a.m.  ECF No. 56 at 40; Ex. 9 (noting that the Children arrived in secondary around 7:40 a.m.).

## III.   Attempts to Determine the Whereabouts of the Children

Around this time, at approximately 9:40 a.m., Cardenas, who had initially driven Julia to the border, appeared at PedWest to inquire about the Children.  ECF No. 57 at

137.  Cardenas told the CBP officer she was the Children's aunt, though she is not a blood relative.  Instead, Cardenas is Julia's godmother, is listed as Julia's legal guardian at her school, and has a notarized letter authorizing her to act on the Children's behalf.  ECF No. 57 at 137-140.  Cardenas identified herself with a birth certificate and driver's license.  *Id.* at 141.  CBP informed Cardenas that the Children were referred for further inspection.  *Id.* at 142.  There was no follow-up by the CBP officer to determine the immigration status of the Children or to have Cardenas obtain identification documentation for the Children.  Assuming it was a routine inspection, Cardenas left and returned to the border sometime later that morning.  *Id.* at 142-43.  The second time, the officers told her that the Children's mom needed to come.  *Id.* at 145.

In the late morning, after attending a doctor's appointment, Thelma learned from her husband, who had been in contact with Cardenas, that there was a problem and that her children could not be located.  ECF No. 60 at 55-56, 58-59.  Thelma testified that she felt "a lot of fear" upon discovering that her children had not successfully crossed the border.  *Id.* at 58.  She immediately asked her husband to take her to the border.  *Id*. at 59.  Upon attempting to bypass the line and cross the border, explaining to the guard that there was "a problem with [her] children," the guard told her that she needed to go back in line like everyone else.  *Id*.  Thelma waited in line for approximately three hours until she reached the front of the line at PedWest.  *Id*.  Around 3 p.m., she explained to an officer that her children had crossed in the morning, were sent for inspection, and had not been heard from since.  *Id*. at 60-61.  According to Thelma, the officer initially told Thelma her children were not there and that she needed to leave.  *Id.* at 61-62.

Given the passage of time between the incident and trial and the fact that none of the AEU officers prepared reports memorializing their contacts with Thelma, the witnesses' recollection as to the contact between CBP and Thelma after 3 p.m. is not clear or consistent.  Nonetheless, the Court finds that Thelma made contact with the

22-cv-380-GPC-BGS

officers in the AEU responsible for the Children around 3:30 p.m.  Officer Julio Corrales, who worked in the AEU, testified that at an undetermined time, he overheard a speakerphone conversation with Officer Hua,[7] an officer working in PedWest, indicating that someone claiming to be the Children's mom had arrived at PedWest and was directed to Pedestrian East ("PedEast") where the AEU is located.  ECF No. 61 at 143-144.  There, Officer Corrales and Officer Anthony Ascher, the AEU Supervisor, met with Thelma.  *Id*. at 105.  Officer Corrales testified that Thelma showed them a photo of what appeared to be a big family gathering, possibly a quinceañera, in an effort to show she was Julia's mother, and that he asked her for more documentation.  *Id*. at 144, 155.  Officer Corrales could not initially recall what time he and Supervisor Ascher met with Thelma, *id*. at 105, 157, but on cross exam, he estimated that Thelma arrived at PedEast between 3:30 – 4 p.m., *id*. at 144.[8]  Upon reviewing the photograph of the family gathering, Officer Corrales' concerns that Julia/Melany was the victim of trafficking or smuggling were eased.  ECF No. 61 at 144-45.

After learning she needed to obtain additional documents to prove her relationship to the Children, Thelma testified that she stayed at the border and sent Cardenas's son to get documentation, including birth certificates, social security cards, and additional photos, from her home in Tijuana.  ECF No. 60 at 64.  Cardenas's son returned to the border with the additional documentation around 6 p.m.  ECF No. 57 at 147; ECF No. 61

---

[7] Officer Hua's first name is not mentioned in the record.

[8] The United States in its proposed Findings of Fact and Conclusions of Law submits that Thelma applied for admission at PedWest at 2:56 p.m. and spoke with Officer Hua and that Hua called Officer Ascher who instructed him to direct Thelma to PedEast.  ECF No. 48 at ¶ 35.  At approximately 3:30 pm, Officer Ascher spoke with Thelma with Officer Corrales interpreting and Thelma showed them a single photograph that appeared to be a family group photo.  *Id*. at ¶ 36.  The photograph satisfied both officers that Julia was not the victim of trafficking and was only being smuggled by a family member.

at 155-56; ECF No. 60 at 63-64.  Upon obtaining the documents, Thelma and Cardenas went to PedEast to show the officers the documents.  ECF No. 57 at 147-48.  After showing the officers the documents, Thelma received a phone call between 6 – 7 p.m. informing her that Oscar was going to be released.[9]  ECF No. 60 at 65-66.

During their contacts, Officers Corrales and Ascher did not ask Thelma for additional information about Julia or Melany or request contact information for Melany's mother.  ECF No. 61 at 133-36.  Officer Corrales testified that there would be no way to confirm Melany's mother's phone number.  *Id*. at 136.  Even after concluding that Oscar was not smuggling Julia/Melany, there was no attempt to obtain Melany's mother's phone number or any other further information about Julia.  *Id*. at 137.

## IV.   Admissibility Enforcement Unit

While Thelma was attempting to get in touch with CBP about the Children, the Children were waiting in the AEU.  The AEU is not at PedWest, so to send the Children to the AEU, the officers loaded them into a van with a handcuffed man and drove them to the main SYPOE between 9 - 10 a.m.  ECF No. 59 at 92-93; ECF No. 56 at 40; Ex. 9. Officers then led them underground, down a hallway of detention cells, and into a waiting area, ECF No. 59 at 95, where they waited for roughly 5 - 6 hours.  They were not electronically checked in to the AEU until a little after 4 p.m.  Ex. 18 (USA-0065); ECF No. 61 at 40-41, 45.  During this long wait, Oscar decided they would be released more quickly if they said Julia was Melany, and he stated as such when he was first interviewed at the AEU.  ECF No. 59 at 99, 103.  Julia initially resisted when Oscar told

---

[9] Officer Corrales testified that Thelma was told that Oscar would be released shortly during her meeting with Officers Ascher and Corrales around 3:30 p.m., ECF No. 61 at 106, however Oscar was not released until 9 – 11 p.m.  ECF No. 60 at 67.

her this plan but later complied.  ECF No. 59 at 107, 198.  Both the Children stated that Julia was Melany when at the AEU.

Around roughly 5 p.m.—after Officers Ascher and Corrales had already met Thelma—Officer Corrales pulled the Children from the waiting area into a private room to interview them.  ECF No. 59 at 113; ECF No. 61 at 101, 158.  He interviewed the Children separately and without a witness, ECF No. 61 at 85, 89, again in violation of CBP policy.  Officer Corrales chose a particular room that he believed automatically recorded audio and video.  ECF No. 61 at 83-84.  However, despite the fact that there was an inquiry from the Office of the Inspector General to the Port Director on April 16, 2019, ECF No. 57 at 12-13, any recording that may have been made was not preserved because CBP routinely deletes recordings, *id.* at 32, 38.

The interviews took roughly an hour each.  ECF No. 61 at 86.  The Children stated that Julia was Melany during the interviews.  ECF No. 61 at 88, 90-91, 143 (Corrales's testimony); ECF No. 57 at 69-70 (Julia's testimony).  According to Julia, Officer Corrales told her that Oscar could be prosecuted for smuggling her if she did not say she was Melany.  ECF No. 57 at 70.  Oscar testified that during his interview, Officer Corrales told him that if he lied, he could be prosecuted and would not be able to pursue his desired career in the Navy, and that he should not get in trouble for someone else. ECF No. 59 at 116-17; ECF No. 61 at 90, 93.  Because the interview recordings were not preserved, the Children's accounts cannot be verified.  But given that Julia had admitted to being Melany since her interview in secondary inspection, it does not make sense that Officer Corrales needed to pressure her to maintain her false claim to being Melany. Nonetheless, however incorrectly, the Children understood from Officer Corrales that if they did not say Julia was Melany, they would be in trouble.  ECF No. 59 at 117. Following the interviews, Officer Corrales asked them to write a statement about what happened that morning.  ECF No. 59 at 118; ECF No. 61 at 95.  The Children then wrote

brief statements, stating that they were cousins, not siblings.  Ex. 13.  Officer Corrales did not notify a parent during the interview, explaining that Julia said she did not know her mother's phone number, ECF No. 61 at 102, and that CBP would not make a phone call for Oscar until it was determined that he was not a smuggler, *id.* at 103.

At some point after the interview, an officer contacted the Mexican Consulate to ask them to interview Julia, which they agreed to do the next morning.  ECF No. 60 at 30, 42.  Also at some point probably after this interview, one of the officers researched Cardenas, the godmother who had driven Julia to the border and initially approached the port of entry asking about the Children, and discovered that she had an alien smuggling conviction.  ECF No. 60 at 25; ECF No. 61 at 100 (Officer Corrales learns that Cardenas initially drove Julia to the border).  The officers stated that this increased their suspicions about the risk of smuggling and Julia's identity.

Sometime around 7:30 p.m., the Children were separated and placed into detention cells, Oscar with young men, and Julia with mothers and children.  ECF No. 59 at 122-23; ECF No. 61 at 117-18.  Other than when all of the detained individuals were brought to the cafeteria for food, CBP kept the Children in these cells until they released them to their mother, which would not be for another few hours for Oscar and another day for Julia.

## V.   Oscar's Release & Julia Held Overnight

After reviewing Thelma's additional documentation, Supervisor Ascher decided to release Oscar.  *Id.* at 106.  Oscar was taken from a detention cell and reunited with his mother between 9 - 11 p.m., around 14 hours after he was first detained.  ECF No. 60 at 67.  CBP refused to release Julia because she continued to say that her name was Melany and that Thelma was her aunt, so they were uncertain of her identity.  ECF No. 59 at 132-33; ECF No. 60 at 40.  But upon releasing Oscar, the officers failed to ask Thelma any questions about Julia/Melany or even if she had a phone number for Melany's mother,

her sister or sister-in-law.  ECF No. 134 - 137.  When asked if the officers suspected Thelma of being involved in a smuggling organization, Officer Corrales explained that they were still investigating. ECF No. 61 at 137.  However, the officers never interviewed Thelma.  ECF No. 61 at 25; ECF No. 61 at 137.

Thelma and Oscar left the border around midnight and stayed at a friend's house in the United States.  ECF No. 59 at 134.  Oscar explained to his mother that they had agreed that Julia was Melany because the officers were not accepting any other answer, ECF No. 59 at 202, and said that it was "his mistake" for suggesting that Julia say she was Melany.  ECF No. 59 at 202; ECF No. 60 at 79-80; ECF No. 61 at 5-6.

**VI.    Day Two & Julia's Release**

In the morning on Tuesday, March 19, 2019, the Mexican consulate conducted their first interview of Julia at the AEU.  In the interview Julia stated that she was Melany. ECF No. 60 at 86.  Also early the following morning, Thelma went to Julia's school in San Ysidro, CA to obtain documentation that Julia was a student there.  ECF No. 60 at 83-84.   She then went to the Mexican Consulate, where she was told that someone had interviewed Julia and Julia was saying that she was Melany.  ECF No. 60 at 84-86.  Thelma explained that there had been confusion over Julia's identity, but that Julia was not Melany.  ECF No. 61 at 20.  The Consulate eventually agreed to conduct another interview.  Still feeling desperate, Thelma then went to the television station Telemundo, where both she and Oscar recorded a live interview.  ECF No. 59 at 136, 205; ECF No. 60 at 87.

Around 3 p.m., the Mexican Deputy Consul reinterviewed Julia at the AEU, ECF No. 57 at 81, and Julia agreed during that interview that she was Julia.  ECF No. 57 at 110.  The Consulate then informed Watch Commander Mariza Marin that Julia might be Julia.  CBP also appears to have received word that Telemundo was reporting on Julia's detention.  This prompted Watch Commander Marin to interview Julia herself.  She

placed a coat over her uniform and briefly and kindly spoke with Julia, spent time reviewing her passport photo, and fairly quickly determined that Julia was indeed Julia. Watch Commander Marin therefore initiated the process to release Julia to the Mexican Consulate, who delivered her to her mother Thelma.  Thelma received the phone call that Julia would be returned to her while at Telemundo and agreed to let Telemundo film their reunion.  ECF No. 60 at 87.  Julia was reunited with her mother and Oscar around 6 p.m. on Tuesday, March 19, about 34 hours after she had first been detained.

## VII.   After-the-Fact: Impact on Plaintiffs

Following the incident, Julia suffered sleeplessness, nightmares, and bed-wetting. ECF No. 60 at 93; ECF No. 57 at 84.  Her most recent nightmare was in early 2024, ECF No. 57 at 86.  She saw a therapist for a year following her detention.  ECF No. 60 at 95. Thelma testified that in 2021, around two years after the incident, when Juila was put under anesthesia for an unrelated surgery, "the doctor called me over because Julia would be screaming that she was Julia, that she was not Melany; and the doctor got scared . . . that's when I became aware that my daughter has not yet overcome."  ECF No. 60 at 96-97.  Oscar also saw a therapist for six months following the incident on the advice of his school counselor who noticed that his grades had gone down and that he was distracted and nervous.  ECF No. 59 at 140-41; ECF No. 60 at 93-94.  Both Children continued to attend school in the U.S., though Thelma initially attempted to withdraw Julia but was dissuaded by the principal.  ECF No. 60 at 91-92.  In addition to Thelma's manifest distress during the incident, she continues to feel fear when the Children cross the border. ECF No. 60 at 99.

CBP did not interview any of the officers involved in the incident after the fact, ECF No. 56 at 148; ECF No. 60 at 35-36, and it never provided Thelma with an explanation of what happened, ECF No. 60 at 89.  CBP continues to maintain that their officers did nothing wrong and were simply trying to confirm Julia's true identity to

maintain her safety.  ECF No. 57 at 26.  On multiple occasions, such as in responding to an inquiry from the Office of the Inspector General and in trial testimony, CBP has even suggested that Julia was not the person in her passport.  ECF No. 57 at 19-22; ECF No. 56 at 115-16.

## CONCLUSIONS OF LAW

### I.    The discretionary function exception does not apply.

Plaintiffs bring each of their claims under the Federal Tort Claims Act, which waives the federal government's sovereign immunity and permits state-law tort suits against the United States.  28 U.S.C. § 2674; 28 U.S.C. § 1346(b)(1); *Brownback v. King*, 592 U.S. 209, 210 (2021).  However, the discretionary function exception excludes from this waiver, "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  Whether this exception applies involves a "particularized and fact-specific" two-part inquiry regarding the nature of the conduct.  *Prescott v. United States*, 973 F.2d 696, 700 (9th Cir. 1992); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  First, the court must determine whether the action is a matter of choice.  *Berkovitz*, 486 U.S. at 536.  "Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive."  *Id.*  The exception similarly does not apply where a federal official violates the constitution.  *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004).  Second, if the challenged conduct involves judgment, the court must decide the exception was designed to apply to that judgment.  *Id.*  The government has the burden of proving that the discretionary function exception applies.  *Prescott*, 973 F.2d at 702.

The United States argues that the discretionary function exception applies because the CBP officers "exercised investigative discretion in carrying out 8 U.S.C. § 1232," ECF No. 48 at 9, which requires CBP officers to screen unaccompanied Mexican children to determine if they are at risk of a severe form of human trafficking, 8 U.S.C. § 1232(a)(4).  It argues that their decision to detain the Children and then release them within the statutorily-mandated 48 hours was within their discretion.  ECF No. 48 at 10. Plaintiffs contend that the discretionary function exception does not apply because the CBP officers violated both the federal constitution and CBP policy in detaining the Children.  ECF No. 49 at 14-17.  The Court concludes that the discretionary function exception does not apply because the Children's detention was in violation of the Fourth Amendment.

The Fourth Amendment mandates that searches and seizures must be reasonable. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).  At the border, the government may stop any traveler without suspicion for a routine border search and seizure.  *Id.* at 538.  Non-routine border seizures, however, must be reasonable.  *Rhoden v. United States*, 55 F.3d 428, 432 (9th Cir. 1995) (applying a reasonableness standard in determining whether a noncitizen's six-day detention at the border was permissible under the Fourth Amendment); *Caban v. United States*, 728 F.2d 68, 70, 75 (2d Cir. 1984) (same).  Thus, non-routine seizures must be supported by reasonable suspicion.  *Montoya de Hernandez*, 473 U.S. at 541 (holding that a reasonable suspicion standard applied to the 16-hour detention of a woman by CBP at an airport on suspicion that she was smuggling drugs in her body); *Sanchez v. United States*, No. 05CV1985, 2006 WL 8455371, at *1-2 (S.D. Cal. July 6, 2006) (holding that using a reasonable suspicion standard to determine if plaintiffs' detention by federal officers at the border on suspicion that their companion resided illegally in the United States and was a terrorist was constitutional).  Here, the Children were detained for long enough that their seizure was

non-routine.  *See United States v. Bravo*, 295 F.3d 1002, 1006 (9th Cir. 2002) ("We have determined that searches involving extended detention or an intrusive search of a person's body are not routine.").

Whether reasonable suspicion exists "depends on the totality of the circumstances, including the scope and the duration of the deprivation."  *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (en banc).  "Even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion."  *Id.* at 968 (cleaned up).

Here, Julia's two-year-old passport card revealed what appeared to be a mole that Julia does not have.  ECF No. 62 at 8; Ex. 63-A.  While the primary officer had encountered anomalies such as this before, she decided to refer the Children to secondary for further inquiry.  *Id.* at 9.  There is no question that referral to secondary was justified and permitted additional reasonable steps to dispel concerns created by the apparent mole.  Although reasonable suspicion may have existed initially to believe that Julia was making a false claim of citizenship by fraudulently using the passport card of another, the duration of her and Oscar's detention was unreasonable and in violation of the Fourth Amendment because officers repeatedly failed to take available steps to investigate their suspicions and failed to follow CBP's own policies and precautions regarding the treatment of detained minors.

The length of time for which a detention is reasonable is not subject to "hard-and-fast time limits," but rather "common sense and ordinary human experience."  *Montoya de Hernandez*, 473 U.S. at 543 (citation omitted).  "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  *See United States v. Sharpe*, 470 U.S. 675, 686 (1985).  Ultimately, the

22-cv-380-GPC-BGS

question "is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id*. at 687.  Common sense and ordinary human experience indicate that it was not reasonable to detain Julia for 34 hours to determine her identity or to detain Oscar for about 14 hours to determine whether he was smuggling or trafficking his sister when multiple means of investigation were available and officers unreasonably failed to pursue them.

Cardenas, Julia's godmother, first inquired about the Children at the border at around 9:40 a.m.  ECF No. 57 at 137.  She returned to the border in the late morning.  *Id.* at 142-43.  Thelma, the Children's mother, presented herself at the border around noon looking for her Children and was directed to the pedestrian line.  ECF No. 60 at 59.  Prior to this time, CBP had failed to attempt to contact her.  She managed to communicate with, and show a photograph to, the CBP officers with authority over the Children by around 3:30 p.m., *id.* at 60-62, and she had obtained birth certificates and social security cards for the Children and additional family photos by around 6 p.m., ECF No. 61 at 155-56; ECF No. 60 at 63-64, 68.

But at their 3:30 p.m. meeting, CBP did not attempt to interview Thelma, ECF No. 61 at 25—who (1) claimed to be both the Children's mother and authorities knew was Oscar's mother; (2) was undisputedly the mother of the holder of the passport allegedly being fraudulently used; and (3) was the aunt of Melany, who Julia was claiming to be. Given her relationship to Julia, Melany, and Oscar, Thelma should have been interviewed to obtain information about the children.  As the mother of Julia, Thelma could have provided additional proof that Julia did not have a mole above her lip and could have addressed any concerns that she herself was part of a smuggling group.  As the aunt of Melany, Thelma could have provided correct identifying information for Melany, permitting officers to verify that Julia was not Melany and allowing them to contact Melany's mother.  If she had been allowed contact with Oscar, she could have learned

22-cv-380-GPC-BGS

what happened and corrected the officers' misconceptions.  Thelma was not informed that Julia was claiming to be Melany until late at night on March 18, and by Oscar, not by CBP.  ECF No. 60 at 77-79.

The officers again failed to interview Thelma when she returned to the border at approximately 6 p.m. to provide additional documents relating to the children.  Finally, even when Oscar was released between 9 – 11 p.m., reflecting a conclusive determination that he was not a trafficker or smuggler, no one interviewed Thelma or asked her for contact information for Melany's mother.

In addition, CBP did not question Michelle Cardenas, who initially drove Julia to the border, approached the border officers twice to ask about the Children, and had crossed with Julia many times in the previous few months.  Ex. 34 at 4.  Given that the officers never confirmed the child's identity as Melany through any documentation or records, the investigative opportunities presented by Cardenas and Thelma would have dispelled suspicions that Julia was Melany in far less time.  Plus, from the start, officers had access to Julia's passport application, which included additional photos of her, but none of the officers chose to look at it.  ECF No. 56 at 9-10; ECF No. 59 at 166-67.  Moreover, Julia also presented her old Mexican school ID, listing her name—Julia.  ECF No. 62 at 23-24.

Instead of following any of these wide-open avenues of investigation, CBP officers elected to place Julia and Oscar in the queue to be processed in the AEU with dozens of other individuals ahead of them, based upon a false confession that was not recorded or witnessed.  The officers apparently did no investigating between sending the Children to the AEU around 9 – 10 a.m. until around 3:30 p.m. when Thelma managed to get in touch with them.  Officer Corrales's interviews were again without a witness.  ECF No. 61 at 85, 89.  And to the extent his interviews were recorded, the recording was not

preserved—despite an inquiry from the Office of the Inspector General about the incident.  ECF No. 57 at 12-13, 32-33, 38.

It was not reasonable to detain a 9-year-old and 14-year-old on suspicion of a false claim of citizenship while their mother and Julia's godmother were trying to reach them and without doing any further investigating for over 5 hours in the middle of the workday.  Officers failed to pursue opportunities to interview Thelma and Cardenas at 9:40 a.m., later in the morning, around noon, around 3:30 p.m., and again around 6 p.m.—opportunities created not by CBP but by Thelma and Cardenas looking for the Children.  In determining that the actions of the officers were unreasonable, the Court has taken into account the CBP officers' failures to abide by common sense and CBP directives aimed to protect the children, such as: (1) having a child's interview witnessed or recorded; (2) providing timely parental notice; and (3) preserving recorded interviews.

The Supreme Court in *Montoya de Hernandez* held that it was reasonable to determine whether the suspect was smuggling drugs in her alimentary canal by detaining her for 16 hours until she had a bowel movement.  473 U.S. at 535, 542-43.  Here the delay is not similarly justifiable.  The Children's 14 and 34 hours in detention were far more than "the period of time necessary to either verify or dispel" the officers' concerns about Julia's identity given the totality of the circumstances.  473 U.S. at 544.  Unlike the "*post hoc* evaluation of police conduct [where one] can almost always imagine some alternative means by which the objectives of the police might have been accomplished," *Sharpe*, 470 U.S. at 686-87, the avenues identified here were presented to the officers on a silver platter and were necessary to determining who Julia/Melany was because otherwise the officers were relying entirely on the statements of children.

The government argues that the duration of the Children's detention was reasonable because "(1) both Oscar and Julia repeatedly stated that Julia was an imposter whom Oscar was assisting to enter the United States unlawfully, (2) a known convicted

22-cv-380-GPC-BGS

human smuggler, Michelle Cardenas, lied about her relationship to the minors when she attempted to effect their release to her, (3) the then-putative mother, Plaintiff [Thelma], did not show up for several hours, (4) when she did show up, [Thelma] did not have identification documents, and (5) Julia told Mexican consular officers that she was Melany[.]"  ECF No. 48 at 12.

First, there is no question that Officer Lara's unrecorded and unwitnessed interrogation of Julia produced a false confession.  Since the confession was not recorded, witnessed or even recounted in any written detail, it will never be known why a 9-year-old U.S. citizen falsely confessed to being someone she is not.  Nonetheless, it is clear that during this one-officer interview, Julia started by stating that she was Julia, but at some point, under the influence and pressure from an intense officer known for getting confessions, she agreed that she was actually Melany.  CBP violated the directive that its officers not interview minors alone.  Having two officers in an interview is meant as a check on the pressure exerted by the officers, and that check failed.  This violation affected the Children's extended detention.  That the Children stated or agreed at multiple points that Julia was Melany created substantial confusion regarding Julia's identity but does not justify 14- and 34-hour detentions to determine the veracity of the 9-year-old's statements.

Second, the Court is also not persuaded that the fact that Cardenas had a decade-old conviction for alien smuggling changed the calculus regarding Julia's identity or risk of being trafficked.  The officers did not discover this until at least eight hours into the Children's detention and after Cardenas had made contact with CBP officers at approximately 9:40 a.m. and around noon.  ECF No. 57 at 140, 143; ECF No. 61 at 100 (Officer Corrales learned that Michelle brought Julia to the border during his early evening interview).  And the Court agrees with Plaintiffs that "[t]he fact that Ms. Cardenas remained at the SYPOE for hours, providing her valid U.S. birth certificate,

identification, and phone number to CBP Officers, weighs heavily against the reasonableness of any suspicion that [Julia] was being smuggled by Ms. Cardenas."  ECF No. 49 at 11.

Third, the Court finds Thelma arrived at the SYPOE around noon and that officers failed to contact Thelma before that time.  When she arrived at the border, she was redirected to the back of the line where she was delayed for three hours.  ECF No. 60 at 59.  Officers failed to tell her what documentation she would need to prove she was Julia's mother and never interviewed her.  ECF No. 61 at 109, 155; ECF No. 61 at 25.  Even after she appeared with the documentation around 6 p.m., it still took approximately 3-4 hours to release Oscar and another 24 to release Julia.  ECF No. 61 at 155-56; ECF No. 60 at 63-64.  Thus, that Thelma did not quickly arrive at the border following the Children's detention does not support the reasonableness of the duration of detention.  Rather, Thelma's presence and interactions with CBP beginning at noon instead indicate that the duration of detention was unreasonable.

For these reasons, the Court therefore holds that the duration of the Children's detention was unreasonable and violated the Fourth Amendment.  As a result, the government has not met its burden to show that the discretionary function exception to the FTCA's waiver of sovereign immunity applies.  *Galvin*, 374 F.3d at 758 (holding that the discretionary function exception does not apply where federal officials violate constitutional rights).

Because the Court finds that the discretionary function exception does not apply due to the Fourth Amendment violation it does not address Plaintiffs' arguments that the government violated their Fifth Amendment substantive due process rights by coercively interrogating the Children or their First and Fifth Amendment rights to familial association by preventing Thelma from being with her Children.  ECF No. 49 at 14-16.

1   The Court also need not address whether the discretionary function exception does not

2   apply because CBP violated its own non-discretionary policies.  *Id.* at 16-17.

3   **II.   False Imprisonment**

4         Plaintiffs first allege a claim of false imprisonment.  Under the FTCA, the Court

5   applies the law of the place in which the incident occurred—here, California.  *See*

6   *Brownback v. King*, 592 U.S. 209, 210 (2021); 28 U.S.C. § 1346(b).  To show tortious

7   false imprisonment under California law, Plaintiffs must demonstrate: "(1) the

8   nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3)

9   for an appreciable period of time, however brief."  *Tekle v. U.S.*, 511 F.3d 839, 854 (9th

10  Cir. 2007).  "A false imprisonment action may also be maintained if the defendant

11  unlawfully detains the [plaintiff] for an unreasonable period of time after an otherwise

12  legal seizure or arrest."  *Rhoden v. United States*, 55 F.3d 428, 430 (9th Cir. 1995)

13  (citation and internal quotation marks omitted); *see also Lincoln v. Grazer*, 163 Cal. App.

14  2d 758, 761 (1958).  Here, the officers clearly intended to detain the Children without the

15  Children's consent and did in fact detain them for an appreciable period of time—14 and

16  34 hours.  And as the Court already explained, the duration of the Children's detention

17  violated the Fourth Amendment.  The United States' actions were therefore without

18  lawful privilege.  The Court thus holds that Plaintiffs have successfully shown each

19  element of false imprisonment and finds that the United States committed tortious false

20  imprisonment against Plaintiffs.

21  **III.   Intentional Infliction of Emotional Distress**

22        Plaintiffs next allege a claim of intentional infliction of emotional distress

23  ("IIED").  In California, IIED requires a showing of "(1) extreme and outrageous conduct

24  by the defendant with the intention of causing, or reckless disregard of the probability of

25  causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional

26  distress; and (3) actual and proximate causation of the emotional distress by defendant's

27

28

outrageous conduct." *Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996). "A defendant's conduct is 'outrageous' when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009) (cleaned up). The defendant need not have "malicious or evil purpose." *KOVR-TV, Inc. v. Superior Ct.*, 31 Cal. App. 4th 1023, 1028, 1031 (1995). "It is enough that defendant devoted little or no thought to the probable consequences of his conduct." *Id.* at 1031-32 (internal quotation marks and citation omitted).

Here, the government's conduct in detaining U.S. citizen children at the border for 14 and 34 hours respectively after obtaining a false confession from Julia about her identity exceeded "all bounds of that usually tolerated in a civilized community." *Hughes*, 46 Cal. 4th at 1051 (citation omitted). At the start of the day, in primary inspection, and when she was first brought to secondary inspection, Julia reported that she was herself. But scared, intimidated, and under pressure in the interview with Officer Lara, she falsely admitted to being someone else, her cousin Melany, a noncitizen. Courts have previously found that intimidating and threating a suspect during an investigatory interview can constitute extreme and outrageous conduct. *See Plascencia v. United States*, No. ECV 17-02515, 2018 WL 6133713, at *10 (C.D. Cal. May 25, 2018) (holding that plaintiffs stated a claim for IIED where agents denigrated, insulted, and threated to deport plaintiff); *Mendia v. Garcia*, 165 F. Supp. 3d 861, 879 (N.D. Cal. 2016) (finding that an officer stating "We'll see if you want to talk when we're deporting your ass!" during an interrogation was sufficient to plead extreme and outrageous conduct); *Crain v. Krehbiel*, 443 F. Supp. 202, 212 (N.D. Cal. 1977) (holding that intimidating and threatening to expose plaintiff's identity to make him sign a statement was extreme and outrageous conduct).

Because Officer Lara's interview with Julia was not witnessed, recorded, or otherwise preserved, there is insufficient evidence to conclude that Julia was threatened.

Still, the Court concludes that the pressure exerted over Julia causing her to falsely confess to fraudulently using the passport card of someone else combined with her and Oscar's extended detention is beyond the bounds "usually tolerated in a civilized community." *Hughes*, 46 Cal. 4th at 1051.

Ultimately, CBP officers failed to pursue the available investigative opportunities which would have reduced the period of detention for the Children substantially. After eliciting the false confession, CBP officers detained the Children with no further investigation for over 5 hours and continued to detain them when their mother came to the port of entry with their birth certificates and social security cards. Between 9:40 a.m. and 3 p.m., Thelma and Cardenas made contact with CBP officers multiple times in an attempt to learn the whereabouts of the Children. ECF No. 57 at 140, 143; ECF No. 60 at 58-59, 60-61. Having failed to independently contact Thelma, none of the officers interviewed her regarding Julia/Melany's identity or their concerns about smuggling or human trafficking or provided clear guidance on what she needed to prove that Julia was her daughter. ECF No. 61 at 25. Even after releasing Oscar, they failed to ask Thelma for contact information for Melaney's mother. Instead, they detained 9-year-old Julia in a detention cell overnight and did not release her until 6 p.m. the next day—some 34 hours after she had initially tried to cross the border as a U.S. citizen with a valid passport card. The severity of the officers' conduct is exacerbated by the fact that they were in positions of power and authority over Plaintiffs. *See Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 498, 498 n.2 (1970) ("The cases and commentators have emphasized the significance of the relationship between the parties in determining whether liability should be imposed."). The Court therefore concludes that the United States' conduct was extreme and outrageous.

Nor was any thought given to the probable consequences that holding the Children for 14 and 34 hours would have on them. The officers recklessly disregarded that

detaining children for an extended period of time without contact with their parents would almost certainly cause the 9-year-old and 14-year-old emotional distress. *See KOVR-TV*, 31 Cal. App. 4th at 1031-32 ("It is enough that defendant devoted little or no thought to the probable consequences of his conduct."). Children are particularly susceptible to emotional distress given their age. *See C.B. v. Moreno Valley Unified Sch. Dist.*, 544 F. Supp. 3d 973, 994 (C.D. Cal. 2021) (considering the plaintiff's susceptibility given "his young age and documented disabilities"). Similarly, it was obvious after Thelma came to the border that continuing to detain her children would cause her severe emotional distress.

The CBP officers' conduct was the actual and proximate cause of the Plaintiffs' "severe and extreme emotional distress." *Sabow*, 93 F.3d at 1454. Severe emotional distress means "emotional distress of such substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure it," and the bar is high. *Young v. City of Visalia*, 687 F. Supp. 2d 1155, 1168-69 (E.D. Cal. 2010) (cleaned up). Julia expressed psychological and physiological changes following the incident, including bedwetting, sleeplessness, and nightmares as recently as this year. ECF No. 60 at 93; ECF No. 57 at 86. The impact on Julia was so enduring that when she was put under anesthesia for surgery in 2021, she started screaming "I'm Julia, I'm not Melany," causing the doctors to become concerned. ECF No. 60 at 96-97. Julia also manifested significant distress testifying about the incident during trial. And both Oscar and Julia began to see a therapist afterwards. In Oscar's case, this was recommended by a school counselor who noticed changes in his behavior—that his grades had gone down and that he was distracted and nervous. ECF No. 60 at 93-94. For Thelma, she felt desperate and helpless during the Children's detention and spent much of the two days crying. ECF No. 60 at 66-67. She continues to feel fear when her children have to cross the border. *Id.* at 99.

22-cv-380-GPC-BGS

Courts have previously found that similar types of emotional distress were sufficiently severe to state an IIED claim. *See Plascencia*, 2018 WL 6133713, at *11 (holding that the plaintiff stated severe emotional distress where she alleged experiencing "headaches, nausea, loss of sleep, fatigue, and anxiety for more than ten months"); *Mendia*, 165 F. Supp. 3d at 879 (holding that plaintiff stated a claim for IIED where they experienced fright, worry, grief, depression, and a gastrointestinal disorder for more than two years following the incident). No reasonable person should be expected to endure the distress suffered by Plaintiffs, *see Young*, 687 F. Supp. 2d at 1168, and it is therefore sufficiently severe and extreme.

In short, defendant's "conduct was extreme and outrageous, having a severe and traumatic effect upon plaintiff's emotional tranquility." *Alcorn*, 2 Cal. 3d at 498. Thus, the Court holds that Plaintiffs have successfully shown IIED.

## IV.   Negligence

Plaintiffs also bring a negligence cause of action under the FTCA. "In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). The government does not contest that they had a duty of due care towards the Children while the Children were in custody. ECF No. 48 at 14; *see Cotta v. Cnty. of Kings*, 686 F. App'x 467, 469 (9th Cir. 2017) ("In California, prison officials owe detainees a duty to protect them from foreseeable harm."). Instead, it argues that the officers did not violate the standard of due care by acting reasonably

under the circumstances and that they did not cause injury.[10]  ECF No. 48 at 14.  The Court disagrees.

As the Court discussed in finding a Fourth Amendment violation, the officers did not act reasonably in detaining the Children for 14 and 34 hours to determine Julia's identity after obtaining a false confession.  They breached their duty of care, and their actions proximately caused severe emotional distress as the Court explained in holding that Plaintiffs have shown IIED.  The Court thus holds that Plaintiffs have successfully shown that the United States was negligent.

## V.    Damages

Having concluded that Plaintiffs have established that the United States bears responsibility for Plaintiffs' injuries related to the incident, the Court now turns to the Plaintiffs' damages.  Plaintiffs request only non-economic compensatory damages for their "mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress."  ECF No. 49 at 17.  Requests for such emotional damages can be established by testimony alone.  *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000).  In closing argument, Plaintiffs requested $800,000 to $1.4 million for Oscar, a similar amount for Thelma, and $1.8 to $3.3 million for Julia.  ECF No. 62 at 69.  The government made no arguments regarding the amount of damages.

---

[10] The parties do not explicitly argue for a particular standard of care.  Because this is not dispositive, the Court does not resolve the issue.  It notes only that "[g]enerally, a greater degree of care is owed to children[.]" *Juarez v. Boy Scouts of Am., Inc.*, 81 Cal. App. 4th 377, 410 (2000), *overruled on other grounds by Brown v. USA Taekwondo*, 11 Cal. 5th 204 (2021); *cf. In re Gault,* 387 U.S. 1, 55 (1967) (holding that, when interrogating a minor without counsel "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.").

The Court first examines the awards in a series of roughly comparable cases. Cases involving false imprisonment and unlawful detention result in a wide range of damages awards, from just tens of thousands of dollars to millions of dollars.  On the low-end are California cases for false imprisonment.  For example, in 1991, a California Appellate court approved a $10,000 award (approximately $23,204 in 2024 dollars) on a false imprisonment claim where plaintiff was arrested, forced to lie face down in the road, handcuffed, and detained for 4 hours on suspicion that he had stolen a car where the registration in the car showed that it was his wife's.  *Washington v. Farlice*, 1 Cal. App. 4th 766, 768, 770-71 (1991).  On the high end, Plaintiffs point the Court towards *Loggervale v. Holland*, 677 F. Supp. 3d 1026 (N.D. Cal. 2023).  There, a Black family, a mother and her two teenage daughters, were separated, handcuffed, and detained without violence in the back of police cars for 91 minutes, even though any reasonable suspicion to stop them had long since dissipated.  *Id.* at 1029-30.  The jury awarded, and the district court refused to reduce, $687,500 in actual damages for the mother, and $1.25 million for each daughter.  *Id.* at 1061 (not including the addition of treble damages).

Most of the other instructive cases involved awards in the hundreds of thousands. In *Martinez v. The Port Auth. of New York & New Jersey*, the Second Circuit approved the district court's decision reducing the emotional distress damages to $200,000 for a false arrest and $160,000 for the deprivation of liberty where plaintiff was handcuffed and detained for 19 hours but not physically assaulted, and suffered from sleeplessness, loss of appetite, anxiety, and suicidal ideation and saw a therapist following the incident. No. 01 CIV. 721, 2005 WL 2143333, at *17-18, 21-22 (S.D.N.Y. Sept. 2, 2005), *aff'd*, 445 F.3d 158 (2d Cir. 2006).

In *Hall v. Ochs* in 1987, the First Circuit approved a $100,000 emotional distress award (approximately $280,900 in 2024 dollars), where the plaintiff was falsely arrested, handcuffed face down on the ground, detained for a little less than two hours, and

22-cv-380-GPC-BGS

suffered recurring nightmares and needed counseling following the incident.  817 F.2d 920, 922, 927 (1st Cir. 1987).

In *Larson v. Nanos*, the Court upheld a jury award of $750,000 for a wife and $500,000 for a husband who were seized from their home in the middle of the night at gun point, handcuffed, and detained for 15-20 minutes while the police searched their home on a mistaken 911 call regarding domestic violence.  No. CV-14-01592, 2016 WL 4592184, at *1 (D. Ariz. June 21, 2016), *aff'd sub nom. Larson v. Napier*, 700 F. App'x 609 (9th Cir. 2017).  The damages were based primarily on their emotional and mental distress as they experienced physical injuries consisting only of scratches and light bruises.  *Id.* at *5-6.

Finally, in *C.B. v. Sonora School District*, the Court upheld a jury award of $215,000 for seizure, IIED, and false arrest where police handcuffed an 11-year-old boy and removed him from school.  819 F. Supp. 2d 1032, 1035, 1041, 1052 (E.D. Cal. 2011), *rev'd in part on other grounds sub nom. C.B. v. City of Sonora*, 769 F.3d 1005 (9th Cir. 2014).

In other factual scenarios involving non-economic emotional damages, courts have approved even higher awards.  The Ninth Circuit upheld $5 million damage awards for officer plaintiffs who suffered paranoia, suicidal ideation, anxiety, high blood pressure, back pain, intestinal problems, loss of reputation, inability to find similar jobs, and divorce as a result of being falsely implicated in a high-profile police scandal.  *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1015, 1029 (9th Cir. 2008).  District courts have also upheld emotional distress damage awards in the millions in discrimination cases.  *See Diaz v. Tesla, Inc.*, 598 F. Supp. 3d 809, 835 (N.D. Cal. 2022) (reducing non-economic damage award to $1.5 million in a case of racial discrimination in the workplace).

The Court finds that substantial awards are appropriate here, within the middle of the range presented by these cases for Oscar and Thelma, and towards the higher end of the range for Julia.  It awards $175,000 to Oscar, $250,000 to Thelma, and $1.1 million to Julia for past and future emotional distress.  The Court finds that a little over $1 million is an appropriate award for Julia because she was very young, only 9-years-old, at the time of the incident and was detained overnight, for a full day and a half without contact with her parents.  She manifested fear and distress during the detention and was so traumatized that she experienced nightmares, bed-wetting, and insomnia following the incident.  She needed counseling for a year and the impact on her has been so enduring that years later when she was put under anesthesia, she referenced the incident.  The Court also finds that her demeanor during her testimony in trial manifested substantial distress.

The Court holds that Oscar is entitled to a much lower, but still notable award of $175,000 because he was somewhat older at the time of the incident, was detained for about half the time and not overnight, and manifested less distress during the detention itself.  Nonetheless, the detention had enough of an impact on him that his school counselor noticed a concerning change in his grades and behavior following the incident. He also needed to attend therapy for six months.

The Court finds that Thelma is entitled to slightly more, $250,000.  This is due to the manifest distress she suffered as a mother of innocent young children who were detained for an extended period of time and whom CBP refused to release to her even when she produced documentation of their relationship.  She also had to watch her children suffer the consequences of trauma after the fact.

Accordingly, the Court finds that $1.1 million for Julia, $175,000 for Oscar, and $250,000 for Thelma appropriately compensate them for their past and future non-economic damages.

**CONCLUSION**

For the reasons above, the Court holds that the United States is liable under the FTCA for false imprisonment, intentional infliction of emotional distress, and negligence. In damages, the Court awards $175,000 to Oscar, $250,000 to Thelma Medina Navarro, and $1.1 million to Julia.

**IT IS SO ORDERED.**

Dated:  June 21, 2024

Hon. Gonzalo P. Curiel
United States District Judge

22-cv-380-GPC-BGS